[No. S071080. Mar. 22, 2001.]

THOMAS M. THOMPSON et al., Plaintiffs and Respondents, v.
DEPARTMENT OF CORRECTIONS et al., Defendants and Appellants.

**COUNSEL**

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Peter J. Siggins, Assistant Attorney General, Morris Lenk, James M. Humes and Susan Duncan Lee, Deputy Attorneys General, for Defendants and Appellants.

Morrison & Foerster, Jordan Eth, John M. Moynihan, Johanna W. Roberts, Jill Fairbrother and Kristin L. Taylor for Plaintiffs and Respondents.

**OPINION**

**KENNARD, J.**—The superior court issued a preliminary injunction ordering the California Department of Corrections (CDC) to permit the spiritual adviser of an inmate facing execution to remain with him until 25 minutes before execution, rejecting the CDC's contention that general security concerns necessitated the adviser's departure 45 minutes before execution. The Court of Appeal dismissed the CDC's appeal, holding that the appeal fell within this court's exclusive jurisdiction over appeals in capital cases. We conclude that the Court of Appeal did have jurisdiction to hear this civil matter, and that the trial court erred in issuing the preliminary injunction.

## I

In July 1997, Thomas M. Thompson, an inmate at San Quentin Prison in Marin County, and his spiritual adviser of choice, Reverend Margaret Harrell (hereafter sometimes collectively referred to as plaintiffs), filed in the Superior Court of Marin County a complaint for declaratory and injunctive relief against the CDC, its director, Thomas Maddock, and Arthur Calderon, who was then the warden of San Quentin Prison (hereafter collectively referred to as defendants). The complaint alleged that Thompson was to be executed at 12:01 a.m. on August 5, 1997, and that defendants' denial of his request to have Reverend Harrell stay with him until he was taken to the execution chamber, which was scheduled to occur 25 minutes before the midnight execution, not only violated his federal and state constitutional rights guaranteeing freedom of religion and prohibiting cruel and/or unusual punishment, but also deprived him of certain rights afforded California prisoners under Penal Code section 2600.[1]

On August 4, 1997, the superior court issued a preliminary injunction ordering defendants to permit Reverend Harrell to stay with Thompson until 11:15 p.m. preceding the 12:01 a.m. execution or until he was taken to the execution chamber, whichever was later. Defendants appealed. The notice of appeal did not specify whether the appeal was to this court or to the Court of Appeal, and the clerk of the superior court sent notification of the appeal and the appellate record to the Court of Appeal. (Cal. Rules of Court, rules 1(b), 10(b).)

While the appeal was pending, the United States Court of Appeals for the Ninth Circuit vacated Thompson's execution date because of pending habeas corpus proceedings unrelated to the issues in this case. The United States Supreme Court's denial of Thompson's federal habeas corpus petition concluded those proceedings. (*Calderon v. Thompson* (1998) 523 U.S. 538 [118 S.Ct. 1489, 140 L.Ed.2d 728].) The Superior Court of Orange County (where defendant's capital trial was held) then scheduled a new execution date of July 14, 1998.

On May 13, 1998, the Court of Appeal dismissed defendants' appeal pertaining to the superior court's preliminary injunction, holding that the matter was within this court's exclusive jurisdiction under article VI, section 11 of the California Constitution. That provision states in pertinent part: "The Supreme Court has appellate jurisdiction when judgment of death has been pronounced." We granted defendants' petition for review, but we did not stay either Thompson's execution or the superior court's preliminary injunction. The execution occurred on July 14, 1998, as scheduled.

---

[1]Unless otherwise stated, all further statutory references are to the Penal Code.

■ Because Thompson has been executed, we could dismiss this proceeding as moot. But when, as here, an otherwise moot case presents important issues that are "capable of repetition, yet evading review" (*Southern Pacific Terminal Co. v. ICC* (1911) 219 U.S. 498, 515 [31 S.Ct. 279, 283, 55 L.Ed. 310]; see also *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1190, fn. 6 [86 Cal.Rptr.2d 778, 980 P.2d 337]; *Alfredo A. v. Superior Court* (1994) 6 Cal.4th 1212, 1219 [26 Cal.Rptr.2d 623, 865 P.2d 56]), we may resolve the issues. The questions presented here ordinarily arise just before execution, when the time to review them is limited.

II

■ Article VI, section 11 of the California Constitution provides: "The Supreme Court has appellate jurisdiction *when judgment of death has been pronounced*. With that exception courts of appeal have appellate jurisdiction when superior courts have original jurisdiction . . . and in other causes prescribed by statute." (Italics added.) When plaintiffs filed this action, Thompson was under a judgment of death. Plaintiffs challenged not the legality of that judgment but the time at which Thompson's spiritual adviser of choice had to leave him before the execution. Contrary to the Court of Appeal's conclusion, this issue does not fall within our exclusive jurisdiction over death penalty appeals, as we explain below.

■ The principles of constitutional interpretation are similar to those governing statutory construction. In interpreting a constitution's provision, our paramount task is to ascertain the intent of those who enacted it. (*Davis v. City of Berkeley* (1990) 51 Cal.3d 227, 234 [272 Cal.Rptr. 139, 794 P.2d 897].) To determine that intent, we "look first to the language of the constitutional text, giving the words their ordinary meaning." (*Leone v. Medical Board* (2000) 22 Cal.4th 660, 665 [94 Cal.Rptr.2d 61, 995 P.2d 191].) If the language is clear, there is no need for construction. (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934].) If the language is ambiguous, however, we consider extrinsic evidence of the enacting body's intent. (*ITT World Communications, Inc. v. City and County of San Francisco* (1985) 37 Cal.3d 859, 868 [210 Cal.Rptr. 226, 693 P.2d 811]; see also *Board of Supervisors v. Lonergan* (1980) 27 Cal.3d 855, 866 [167 Cal.Rptr. 820, 616 P.2d 802]; *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 245-246 [149 Cal.Rptr. 239, 583 P.2d 1281].)

The phrase in article VI, section 11 of the California Constitution (article VI) conferring on this court exclusive appellate jurisdiction "when judgment

of death has been pronounced" is ambiguous. It could refer only to direct appeals from the judgment of death. Or, as the Court of Appeal concluded, the phrase could also encompass appeals such as the one in this case, challenging only the time when the condemned inmate's personal spiritual adviser must leave the inmate before the execution. To resolve this ambiguity, we turn to the history of section 11 in article VI.

The current phrase in article VI, section 11 granting this court exclusive appellate jurisdiction "when judgment of death has been pronounced" originated in former article VI, sections 4 and 4b.

Section 4 of former article VI was first enacted as part of the Constitution of 1879, when there were no Courts of Appeal. It gave this court appellate jurisdiction "in all criminal cases prosecuted by indictment, or information in a Court of record on questions of law alone." (*Ibid.*)

In 1904, when a provision was added to the California Constitution authorizing the creation of the Courts of Appeal, section 4 of former article VI was amended to provide: "The Supreme Court shall have appellate jurisdiction on appeal from the superior courts . . . on questions of law alone, in all criminal cases where judgment of death has been rendered . . . ." (Cal. Const., former art. VI, § 4, as amended Nov. 8, 1904.) The amended section also gave the Courts of Appeal jurisdiction "in all criminal cases prosecuted by indictment or information . . . excepting criminal cases where judgment of death has been rendered." (*Ibid.*) This language was retained when former article VI, section 4 was again amended in 1918. (*Id.*, as amended Nov. 5, 1918.)

In 1928, section 4 of former article VI was divided into four parts: sections 4, 4a, 4b, and 4c. Section 4 retained the phrase conferring on this court appellate jurisdiction "in all criminal cases where judgment of death has been rendered . . . ." (Cal. Const., former art. VI, § 4, as amended Nov. 6, 1928.) Moved into section 4b was the phrase that originally appeared in the 1904 amendment of section 4 describing the appellate jurisdiction of the Courts of Appeal as applying to "all criminal cases . . . except where judgment of death has been rendered." (Cal. Const., former art. VI, § 4b, as adopted Nov. 6, 1928.)

Thus, beginning in 1904, when the California Constitution authorized creation of the Courts of Appeal, section 4 of former article VI limited this court's exclusive appellate jurisdiction in matters relating to capital punishment to "criminal cases." Under that section, the appeal in this case would not have fallen within this court's exclusive capital jurisdiction,

because this is not a *criminal* but a *civil* case, in which plaintiffs invoked the equitable powers of the superior court pertaining to a matter that could not have been raised in Thompson's appeal from his sentence of death. (See generally *In re Carpenter* (1995) 9 Cal.4th 634, 646 [38 Cal.Rptr.2d 665, 889 P.2d 985] [superior court has jurisdiction to hear habeas corpus petition in capital case so long as it does not decide issue that could be raised in pending appeal].)

In 1966, the California Constitution was revised. As part of the revision, former article VI, section 4, pertaining to this court's exclusive appellate jurisdiction "in all criminal cases where judgment of death has been rendered," was renumbered as article VI, section 11, and the limiting words "in all criminal cases" were deleted. As we shall explain, however, this deletion did not alter the scope of this court's exclusive jurisdiction in capital cases.

The 1966 revision was largely drafted by the California Constitutional Revision Commission. Regarding article VI as a whole, "[a]n examination of the records of the commission's official proceedings reveals that its basic objective in revising article VI was 'to delete provisions which were redundant, obsolete, or unnecessary for inclusion in the Constitution, such as procedural matters which could be prescribed or provided for by statute or court rule.' [Citation.]" (*Powers v. City of Richmond* (1995) 10 Cal.4th 85, 94 [40 Cal.Rptr.2d 839, 893 P.2d 1160] (plur. opn. of Kennard, J.).) Regarding section 11 of article VI in particular, the commission explained that it had deleted certain references as "unnecessary" and it had preserved this court's exclusive jurisdiction "in death penalty cases" because of "the extreme nature of the penalty." (Cal. Const. Revision Com., Proposed Revision (1966) p. 91.) Nowhere in the commission's comments did it express an intent to alter the *scope* of our exclusive jurisdiction over capital cases.

As a result, this court's exclusive death penalty jurisdiction, as currently described in section 11 of article VI, is the same as it was in section 4 of former article VI, applying only to *criminal cases* in which a judgment of death has been rendered. Because, as explained above, this is not a criminal case, the appeal does not fall within this court's exclusive jurisdiction under article VI, section 11 of the California Constitution.[2]

In reaching a contrary conclusion, the Court of Appeal relied on a 1996 minute order by this court in *Williams v. Department of Corrections* (Supreme Ct. Minutes, Apr. 30, 1996, S053348; Super. Ct. Marin County, No.

---

[2]Although the Courts of Appeal have appellate jurisdiction over noncriminal appeals in matters involving the death penalty, this court retains ultimate control over all such proceedings through our discretionary power to transfer an appeal to this court (Cal. Const., art. VI, § 12, subd. (a)) and through our power to grant review—on motion of a party or on our own motion—once a Court of Appeal has decided such a matter.

167264) (the *Williams* order), in which this court directed the CDC to permit Reverend Harrell to stay with Keith Williams, a prisoner facing execution, "until 11:15 p.m. . . . or until final preparations for removal of Williams from the area of the holding cell to the execution chamber are ready to begin, whichever is later." In concluding that it lacked jurisdiction to hear the appeal in the case now before us, the Court of Appeal reasoned: "*[R]esolving the present dispute requires an interpretation of perceived ambiguities in the Williams order*, an unpublished decision issued by the Supreme Court in the exercise of its original appellate jurisdiction. *We cannot do this without encroaching on the Supreme Court's exclusive domain.* Further, for us to assume the role of interpreter of Supreme Court orders involving the implementation of the death penalty could well result in intolerably inconsistent interpretations among the five divisions of this court. . . . We cannot accept jurisdiction to interpret the *Williams* order and resolve the present appeal without undermining the very goals of consistency and expediency that article VI, section 11, seeks to ensure by granting the Supreme Court exclusive appellate jurisdiction once judgment of death has been pronounced." (Italics added.)

The Court of Appeal's premise—that this case could be decided only by interpreting our *Williams* order—is faulty. ■ In *California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 9 [270 Cal.Rptr. 796, 793 P.2d 2], we said that "our minute orders . . . cannot serve as precedent to guide future decisions." By this language, we did not intend to preclude trial courts and the Courts of Appeal from considering our minute orders if doing so would assist them in rendering a decision. The statement in question is simply a reminder that, unlike our decisions rendered after granting review, hearing oral argument, and preparing a written opinion, our minute orders are not binding precedent. (Cf. *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].) ■ Because our *Williams* order is not binding precedent, it was not essential for the Court of Appeal to interpret it to decide this appeal.

Moreover, assuming for the sake of argument that to decide the appeal here, the Court of Appeal would have had to construe "ambiguities" it perceived in our *Williams* order, the necessity of doing so would not necessarily be "encroaching" upon our jurisdiction, contrary to the Court of Appeal's conclusion. Courts of Appeal must, and do, interpret the scope of this court's decisions. If they reach conflicting interpretations, it is up to this court to resolve the conflict.

Even if the Court of Appeal had been right in concluding it lacked jurisdiction to hear the matter, it erred in dismissing the appeal. As mentioned earlier, the notice of appeal that defendants filed in the superior court

did not specify the court to which they were appealing. They were not required to do so. (See Cal. Rules of Court, rule 31(b) ["The notice [of appeal] need not specify the court to which the appeal is taken . . . ."].) It was the superior court that transmitted the appellate record to the Court of Appeal. Once the Court of Appeal decided it had no jurisdiction in the matter, it should, instead of dismissing defendants' appeal, have asked this court to transfer the matter to itself. (See Cal. Rules of Court, rule 20.)

## III

Also encompassed within our grant of review is defendants' contention that the trial court erred in issuing a preliminary injunction ordering defendants to allow Reverend Margaret Harrell to remain with Thompson until he was taken to the execution chamber. Preliminarily, we note two issues *not* presented in this case.

First, plaintiffs do not allege that inmate Thompson's religious views differed materially from those of the "state employee spiritual advisor" whom defendants would have permitted to stay with Thompson until he was taken to the execution chamber, if Thompson had desired such presence. Indeed, plaintiffs describe neither Thompson's religious views (presumably, Thompson had Christian beliefs, based on his request that Reverend Harrell give him communion) nor those of the prison's spiritual adviser. Rather, they argue that Thompson was entitled to have Reverend Harrell with him on the night of his execution because they had developed a "longstanding, intimate spiritual relationship." Thus, we need not consider here whether, in the last minutes before an execution, prison officials may deny the prisoner access to a spiritual adviser of choice and permit only the presence of a spiritual adviser whose views differ significantly from the inmate's.

Second, at an early stage in this litigation defendants argued that Reverend Harrell had to leave Thompson *six hours* before his execution. But defendants made no showing that legitimate penological interests required Reverend Harrell's removal at that time, and they have now abandoned that claim. Instead, defendants contend only that the trial court should have permitted them to require Reverend Harrell to leave Thompson 20 minutes before Thompson's departure for the execution chamber, roughly 45 minutes before his execution.

When a prisoner is to be executed by lethal injection, San Quentin Prison observes this internal regulation: "Approximately 45 minutes prior to execution, the following procedure will be followed: [¶] (1) The Warden, Associate Warden, Unit III and two (2) physicians arrive at the execution via the

outside entrance. The Warden talks briefly with the condemned inmate. [¶] (2) At the Warden's signal, the Lieutenant in Charge of the chamber unlocks the inmate's cell and asks that the inmate remove all of his clothing, including socks. One of the overnight officers, on signal of the Lieutenant, brings to the cell a new pair of blue jeans and a blue shirt only. . . . When the inmate has put on only the blue jeans, the heart monitor is fitted to the condemned inmate, under the direction of the attending physicians. [¶] (3) The condemned inmate is then assisted in putting on the blue shirt, trousers' waistband is adjusted and the trousers' legs rolled up, if necessary. The condemned man is now ready for the chamber. The condemned inmate remains in the cell, accompanied by the spiritual advisor,[3] until signaled by the Warden that the appointed time [for the inmate to be moved into the execution chamber] has arrived." (San Quentin Institutional Proc. No. 770, pt. VI.D.4.c.(5)(d), underscoring in original.)

Citing subdivision (1) of this internal regulation, defendants argued in superior court that Reverend Harrell would have to leave Thompson 45 minutes before the scheduled execution. (San Quentin Institutional Proc. No. 770, pt. VI.D.4.c.(5)(d)(1).) Citing subdivision (3) of the regulation, plaintiffs insisted that Harrell should be permitted to stay with Thompson until he had to be taken to the execution chamber. (*Id.*, pt. VI.D.4.c.(5)(d)(3).) This occurs approximately 25 minutes before the scheduled execution. (See *id.*, pt. VI.A.10.a.(4).)[4]

No witnesses testified at the hearing. Instead, the parties submitted declarations.

The declarations of plaintiffs Thompson and Reverend Harrell established that Harrell, the Director of Prisoner Services for the Marin County Sheriff's Department, had been Thompson's spiritual adviser for many years and that

---

[3]We agree with defendants that the term "spiritual advisor" in this regulation means the state employee spiritual adviser (the prison chaplain), not the inmate's spiritual adviser of choice. (See San Quentin Institutional Proc. No. 770, pt. VI.D.4.c.(5)(a)(1).) We reject plaintiffs' claim, raised for the first time in this court, that the "spiritual advisor" mentioned in this internal regulation is one selected by the condemned inmate.

[4]Defendants initially intended to have Reverend Harrell leave Thompson at 6:00 p.m., six hours before the scheduled execution. At the superior court hearing, they modified their position as a result of this court's *Williams* order (see p. 124, *ante*), which directed the CDC in that case to permit Reverend Harrell to stay with condemned inmate Keith Williams "until 11:15 p.m. . . . or until *final preparations for removal of Williams from the area of the holding cell to the execution chamber are ready to begin*, whichever is later." (Italics added.) At the hearing, plaintiffs and defendants agreed the *Williams* order was controlling, but plaintiffs contended the italicized phrase referred to 25 minutes before execution, as described in subdivision (3) of the procedure No. 770, part VI.D.4.c.(5)(d), while defendants argued it referred to 45 minutes before execution, as described in subdivision (1).

Thompson wanted her with him as long as possible on the night of the execution. Plaintiffs also submitted declarations from several clergy members describing the need for religious guidance as particularly critical in the last minutes of life, when access to a prison chaplain is no substitute for communication with one's spiritual adviser of choice. In addition, declarations from persons involved in capital litigation in Louisiana, South Carolina, and Virginia stated that those states allow contact visits between condemned inmates and the clergy of their choice up to the time of execution, that this does not cause any security problems, and that it has a calming effect on the condemned inmates.

The defense countered with a declaration from San Quentin Warden Arthur Calderon, one of the defendants in this case, expressing safety and security concerns if Reverend Harrell were to stay with Thompson beyond 45 minutes before the execution: "First, all of Thompson's witnesses [to the execution, which included Reverend Harrell] must be transferred to the witness gallery together as a group for safety, security and administrative reasons. For obvious reasons, it promotes safety and security to reduce the amount of interaction between Thompson's witnesses and other witnesses and observers. Second, the identity of the correctional staff who comprise the execution team [which presumably includes the staff members who would prepare Thompson for execution during the period at issue in this case] must be kept as confidential as possible for the security of the institution, and for the safety of the officers and their families. Finally, the . . . direct transfer [of Reverend Harrell] from the holding cell area to the witness gallery in the execution chamber could be disruptive, could divert staff attention from other important duties or concerns, and could unnecessarily expose staff to additional stress and trauma. All of these factors could interfere with the execution proceeding in an orderly, professional and safe manner."

The superior court agreed with plaintiffs, and ordered defendants to allow Reverend Harrell to remain with Thompson until his departure for the execution chamber, roughly 25 minutes before the scheduled execution. As mentioned earlier, we declined to stay the superior court's injunction pending resolution of the appeal. According to plaintiffs, defendants complied with the superior court's injunction, allowing Reverend Harrell to stay with Thompson until he was taken to the execution chamber.[5]

Because plaintiffs' complaint asserted both statutory and constitutional grounds, we address the statutory issue first. This is consistent with the

---

[5]Plaintiffs have filed a "Motion for Production of Additional Evidence and for Independent Factual Determination on Appeal," asking this court to make factual findings that Reverend Harrell remained with Thompson until the latter was taken to the execution chamber, that 10 minutes later Harrell was escorted to the witness viewing area, and that no guards admonished

well-established rule that we do not address constitutional questions unless necessary. (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230 [45 Cal.Rptr.2d 207, 902 P.2d 225].)

Before its amendment in 1994, section 2600 provided: "A person sentenced to imprisonment in a state prison may, during any such period of confinement, be deprived of such rights, and only such rights, as is [*sic*] necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public." We construed this section in *In re Arias* (1986) 42 Cal.3d 667 [230 Cal.Rptr. 505, 725 P.2d 664]. In that case, inmates of the California Youth Authority (CYA) alleged that a plan to install an electronic listening device in the chapel of the facility in which they were housed would deny them their right to freedom of religion, thereby violating section 2600. We set forth a three-step inquiry: "(1) Are any 'rights' implicated? (2) If they are, does a 'reasonable security' problem exist which might permit a deprivation of rights under the statute? (3) If so, to what extent are deprivations of those rights 'necessary' to satisfy reasonable security interests." (*In re Arias, supra*, 42 Cal.3d at pp. 689-690.)

We concluded that installation of a listening device in the chapel could have a chilling effect on the inmates' conversations with their spiritual adviser, thus implicating their statutory right to religious freedom. (*In re Arias, supra*, 42 Cal.3d at pp. 690-696.) We pointed out that CYA had made no effort to explore installation of less intrusive electronic security devices to maintain security in the chapel. (*Id.* at pp. 697-700.)

Under the just-described *Arias* test, there may be some merit to plaintiffs' contention that defendants' rule requiring Reverend Harrell to leave upon

Harrell in any way while she was with Thompson. Plaintiffs also ask this court to take judicial notice of records of both this court and the Superior Court of Marin County (motions, points and authorities, hearing transcripts, and court orders) pertaining to litigation between them and defendants that occurred just before Thompson's execution in July 1998. In that litigation, defendants asserted that even if the preliminary injunction the superior court issued in this case required them to permit Reverend Harrell to remain with Thompson until he was taken to the execution chamber, they could deny Reverend Harrell the opportunity to witness the execution. The superior court ruled that this assertion was an attempt to circumvent its preliminary injunction, and we denied defendants' petition for extraordinary relief challenging this ruling.

The issue here is whether, based on the evidence at the time of the hearing in the superior court, the trial court could order defendants to permit Reverend Harrell to remain with Thompson until he was taken to the execution chamber. Irrelevant to that question are events occurring after the superior court's issuance of a preliminary injunction. We therefore deny the request for judicial notice. (See *Mangini v. R.J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73] [courts may judicially notice only relevant matters].)

arrival of the warden, the associate warden of unit III, and two physicians (45 minutes before the execution), and not allowing Harrell to stay with Thompson until he was taken to the execution chamber (25 minutes before the execution) violated section 2600. But the Legislature amended section 2600 in 1994, eight years after our decision in *In re Arias, supra,* 42 Cal.3d 667. Instead of providing, as it did when we decided *Arias,* that a prisoner may be deprived only of those rights "necessary in order to provide for the reasonable security of the institution in which he is confined and for the reasonable protection of the public," section 2600 now states: "A person sentenced to imprisonment in a state prison may during that period of confinement be deprived of such rights, and only such rights, as is [*sic*] *reasonably related to legitimate penological interests.*" (Stats. 1994, ch. 555, § 1, p. 2821, italics added.) The italicized language is identical to that used in the federal test the high court articulated in *Turner v. Safley* (1987) 482 U.S. 78 [107 S.Ct. 2254, 96 L.Ed.2d 64] (*Turner*), decided the year after we filed *Arias.* In *Turner,* the United States Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is *reasonably related to legitimate penological interests.*" (*Id.* at p. 89 [107 S.Ct. at p. 2261], italics added.)

Recently, two Court of Appeal decisions involved issues arising under the Legislature's 1994 amendment of section 2600. In neither case, however, did the Court of Appeal consider the continued viability of the *Arias* test in light of this amendment. In *In re Roark* (1996) 48 Cal.App.4th 1946 [56 Cal.Rptr.2d 582], the Court of Appeal simply assumed the applicability of the *Arias* test in addressing an inmate's contention that the prison violated section 2600 when it required his attorney to remove his artificial leg before visiting the inmate. (*Roark,* at p. 1948.) And in *Small v. Superior Court* (2000) 79 Cal.App.4th 1000 [94 Cal.Rptr.2d 550], where the issue was whether certain restrictions imposed by a prison warden on visits between prison inmates and their attorneys violated section 2600, the Court of Appeal did not even mention our decision in *In re Arias, supra,* 42 Cal.3d 667, simply assuming that a section 2600 claim is governed by the high court's test in *Turner, supra,* 482 U.S. 78, 89-91 [107 S.Ct. 2254, 2261-2262], which was decided after *Arias.* (*Small v. Superior Court, supra,* 79 Cal.App.4th at p. 1011.)

Because the Legislature quoted directly from *Turner, supra,* 482 U.S. 78, when it amended section 2600 to state that prison regulations are valid if they are "reasonably related to legitimate penological interests," we conclude that the Legislature intended to abrogate this court's three-part test in *In re Arias, supra,* 42 Cal.3d 667, in favor of the test the United States Supreme Court established in *Turner.* As we explain below, there are significant differences between the two tests.

In *Turner, supra*, 482 U.S. 78, inmates at a Missouri prison challenged the constitutionality of two prison regulations, one allowing prisoners to marry other prisoners only with permission of the prison superintendent, the other permitting inmates to correspond with other inmates only if the prison deemed the correspondence to be in the " 'best interest of the parties involved.' " (*Id.* at p. 82 [107 S.Ct. at p. 2258].)

In holding that a prison regulation is valid if it "is reasonably related to legitimate penological interests" (*Turner, supra*, 482 U.S. at p. 89 [107 S.Ct. at p. 2261]), the United States Supreme Court mentioned four factors to be considered. First, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." (*Id.* at p. 89 [107 S.Ct. at p. 2261].) Second, the court should consider "whether there are alternative means of exercising the right that remain open to prison inmates," in which case the court "should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.' " (*Id.* at p. 90 [107 S.Ct. at p. 2262].) Third is the "impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." (*Ibid.*) When such accommodation "will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." (*Ibid.*) Fourth, the "absence of ready alternatives is evidence of the reasonableness of a prison regulation," while "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable . . . ." (*Ibid.*) Applying this test, the high court concluded that the Missouri prison regulation limiting inmate-to-inmate correspondence was reasonably related to legitimate security interests, but that the marriage restriction was constitutionally invalid.

A week after that decision, the high court applied the *Turner* test in *O'Lone v. Estate of Shabazz* (1987) 482 U.S. 342 [107 S.Ct. 2400, 96 L.Ed.2d 282] (*O'Lone*). In that case, as here, the plaintiffs challenged a prison's rules as violating the right to free exercise of religion. Specifically, Muslim inmates of a New Jersey prison contended that the prison's regulations, which required them to work outside the facility on weekdays, violated their First Amendment rights by preventing them from attending Jumu'ah, a service that is commanded by the Koran and must be held on Friday afternoons.

The high court upheld the prison regulation. Applying the four-factor test of *Turner, supra*, 482 U.S. 78, it concluded: (1) There was a logical connection between the prison regulation and the government's legitimate

interest in ensuring prison security. Requiring inmates to work outside the prison eased tensions among the overcrowded prison population. (2) The Muslim prisoners had alternative means to exercise their religious beliefs. Although their work schedule prevented them from attending Jumu'ah on Friday afternoons, they were "not deprived of all forms of religious exercise, but instead freely observe[d] a number of their religious obligations." (*O'Lone, supra,* 482 U.S. at p. 352 [107 S.Ct. at p. 2406].) (3) Accommodating the Muslim inmates' desire to attend the religious service by permitting them to return from work early on Fridays would be administratively burdensome and would create security risks; also, placing them on work details that did not require them to leave the prison on Fridays would create a perception of favoritism because the Muslim inmates would be able to escape a " 'rigorous work detail,' " whereas others would not. (*Id.* at p. 353 [107 S.Ct. at p. 2407].) (4) There were no " 'obvious, easy alternatives' " to the prison's regulation. (*Ibid.*)

■ To determine whether defendants here violated section 2600 by not permitting Reverend Harrell to stay with Thompson until he was taken to the execution chamber, we apply the high court's test in *Turner, supra,* 482 U.S. 78, as clarified a week later in its decision in *O'Lone, supra,* 482 U.S. 342.

As explained earlier, the first factor under the *Turner* test is whether there is a valid connection between the prison regulation and the government interest put forward to justify it. Defendants argue that permitting a prisoner's personally chosen spiritual adviser to stay with the prisoner during the last 20 minutes before the prisoner's departure for the execution chamber poses a security risk. During that time, as described in the prison's internal regulation (see p. 127, *ante*), members of the execution team change the clothing of the condemned inmate and attach a heart monitor to his chest. If the prisoner's spiritual adviser of choice is allowed to stay with the prisoner during that time, the adviser may learn the identities of the members of the execution team. In his declaration, Warden Calderon, one of the defendants, explained that "the identity of the correctional staff who comprise the execution team must be kept as confidential as possible for the security of the institution, and for the safety of the officers and their families."

Defendants' fear that members of the execution team and their families could be subject to retaliation if their identities became known to a wider circle of people, including the prison's inmates, certainly is a "legitimate governmental interest." (*Turner, supra,* 482 U.S. at p. 89 [107 S.Ct. at p. 2261].) Here, there is a " 'valid, rational connection' " (*ibid.*) between the challenged rule and the government's asserted interest. This connection is not "so remote" as to render the rule "arbitrary or irrational." (*Id.* at pp. 89-90 [107 S.Ct. at p. 2261].)

Plaintiffs argue that defendants have not shown that permitting a spiritual adviser of choice to remain until a prisoner's departure for the execution chamber has caused security problems in other jurisdictions. But defendants need not make such a showing. " '[I]t "does not matter whether we agree with" the defendants or whether the policy "in fact advances" the jail's legitimate interests. [Citation.] *The only question that we must answer is whether the defendants' judgment was "rational," that is, whether the defendants might reasonably have thought that the policy would advance its interests. . . .'* [E]ven in the absence of institution-specific or general social science evidence, as long as it is plausible that prison officials believed the policy would further a legitimate objective, the governmental defendant should prevail on *Turner*'s first prong." (*Frost v. Symington* (9th Cir. 1999) 197 F.3d 348, 355.) As we noted earlier, here there is a reasonable basis for defendants' conclusion that the prison policy at issue would advance a legitimate security interest.

The second *Turner* factor is whether the prisoner has alternative means of exercising the constitutional right in question. Here, defendants do not deny prisoners sentenced to death the opportunity to practice their religion. Condemned inmates can meet with their personally chosen spiritual adviser of choice for as long as they want before the execution. The only restriction is that the adviser leave 45 minutes before the scheduled execution. As in *O'Lone, supra*, 482 U.S. 342, the prisoner here has an alternative means of exercising religious rights.

The third *Turner* factor is the effect that accommodation of the prisoner's asserted constitutional right will have on guards, other inmates, and the allocation of prison resources. As we explained earlier in discussing the first *Turner* factor, defendant Warden Calderon stated in his declaration that permitting a condemned prisoner's spiritual adviser of choice to remain with the prisoner during the last 20 minutes preceding the prisoner's removal to the execution chamber would enable the adviser to learn the identities of the members of the execution team, posing a security risk to the team members and their families. In this matter of prison administration, we defer to Warden Calderon's evaluation of the security risks. As the high court has stated, "even where claims are made under the First Amendment" we may not " 'substitute our judgment on . . . difficult and sensitive matters of institutional administration' [citation] for the determinations of those charged with the formidable task of running a prison." (*O'Lone, supra*, 482 U.S. at p. 353 [107 S.Ct. at p. 2407].)

The fourth *Turner* factor is the availability of ready alternatives to the prison regulation. Plaintiffs here have not suggested any alternatives that would eliminate the security concerns discussed above.

We certainly do not suggest that Thompson's desire to practice his religion with his spiritual adviser of choice in the last minutes before his execution is trivial or insubstantial. To the contrary. Many, perhaps most, religions view the last minutes of life as a time when the need for spiritual advice and comfort is particularly compelling. But prisoners do not enjoy the unrestricted freedom of choosing the time, place, and manner of practicing their religions. As the high court has observed, prison administrators, not the courts, must make " 'the difficult judgments concerning institutional operations,' " so long as their rules are "reasonably related to legitimate penological interests." (*Turner, supra*, 482 U.S. at p. 89 [107 S.Ct. at p. 2261].) This standard "ensures the ability of corrections officials 'to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration,' . . . and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to 'resolution by decree.' " (*O'Lone, supra*, 482 U.S. at pp. 349-350 [107 S.Ct. at p. 2404]; see also *Lewis v. Casey* (1996) 518 U.S. 343, 360 [116 S.Ct. 2174, 2184, 135 L.Ed.2d 606] [federal district court gave insufficient deference to prison officials when it invalidated prison's restrictions on inmates' access to law library].)

For these reasons, we conclude that defendants' policy requiring Reverend Margaret Harrell to leave Thompson 20 minutes before his departure for the execution chamber did not violate section 2600. For the same reasons, this rule did not violate the First Amendment's guarantee of freedom of religion.[6] Therefore, the superior court erred when it issued a preliminary injunction prohibiting defendants from removing Reverend Harrell until the time came to take Thompson to the execution chamber.

## DISPOSITION

For the reasons given in part II of this opinion, the Court of Appeal erred when it dismissed defendants' appeal for lack of jurisdiction. In part III, however, we resolved the merits of that appeal by concluding that the trial court erred when it issued a preliminary injunction directing defendants to permit Reverend Harrell to remain with Thompson until his departure for the

---

[6]Although plaintiffs' petition for a preliminary injunction also contained a pro forma allegation that defendants violated the right to freedom of religion in the California Constitution (see Cal. Const., art. I, § 4), plaintiffs make no argument that in the context of this case the state Constitution affords protection greater than that provided by the federal Constitution. Therefore, we do not address that issue here. For the same reason, we do not address plaintiffs' equally cursory assertion that defendants' rule requiring Reverend Harrell to leave 20 minutes before Thompson's departure for the execution chamber violated the federal Constitution's prohibition against cruel *and* unusual punishment (U.S. Const., 8th Amend.) and the California Constitution's prohibition of cruel *or* unusual punishment (Cal. Const., art. I, § 17).

execution chamber. Thus, there are no remaining matters for the Court of Appeal to decide. Because Thompson has now been executed, a remand to the trial court with directions to vacate its preliminary injunction would serve no purpose. We therefore affirm the Court of Appeal's order dismissing the appeal.

George, C. J., Mosk, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Respondents' petition for a rehearing was denied May 16, 2001.