Filed 6/27/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ARTHUR GILBERT, | |
| Plaintiff and Appellant, | G049148 |
| v. | (Super. Ct. No. BC487949) |
| JOHN CHIANG, as STATE CONTROLLER, etc. | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge. Reversed.

Jones Day, Elwood Lui, Erica L. Reilley, Peter E. Davids and Charlotte S. Wasserstein for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Mark R. Beckington and Anthony R. Hakl, Deputy Attorneys General, for Defendant and Respondent.

Morrison & Foerster LLP, Miriam Vogel and Dale K. Larson as Amicus Curiae on behalf of Plaintiff and Appellant.

\*        \*        \*

Article VI, section 17 of the California Constitution (Section 17) states, in pertinent part: "A judge of a court of record may not practice law and during the term for which the judge was selected is ineligible for public employment or public office other than judicial employment or judicial office . . . ."

Arthur Gilbert is the Presiding Justice of the Second Appellate District, Division Six. He filed this action to obtain a determination that Section 17 would not render him ineligible for other public office or public employment if he resigned from his judicial office before the completion of his current 12-year term. He argued a judge's term in office necessarily ends when that judge resigns or retires. Therefore, Section 17 would not prohibit him from pursuing other public office or public employment following his retirement, no matter when such retirement occurred. Gilbert filed his action against the state Controller, who is the enforcer of this provision. It is the Controller's position no salary or benefits will be paid to a former judge or justice for a new public office or other public employment, before the expiration of the judge's term. The Controller contends that, in the case of a judge or justice, the duration of the specified "term" is unaffected by the judge or justice's resignation or retirement.

The trial court ruled against Gilbert, concluding that, because his judicial "term" is defined by reference to the calendar, and not by the length of his own incumbency, his constitutionally declared ineligibility for other public office or public employment extends for his full 12-year calendar term, without regard to whether he resigns or retires from his judicial office before that 12-year period ends.

We reverse the judgment. Section 17 prohibits only "a judge of a court of record" from engaging in specified conduct and renders only such a judge "ineligible" for nonjudicial public employment or public office "during the term for which the judge was selected." (*Ibid*.) But, as the Controller concedes, a person who has retired or resigned from a judicial office no longer qualifies as "a judge of a court of record." Therefore, a

2

person who has resigned or retired from judicial office would no longer be governed by Section 17. By its own terms, Section 17 applies only to sitting judges.

Because Section 17 applies only to sitting judges and not to persons who have resigned or retired from a judicial office, it does not prohibit such persons from holding other public office or engaging in other public employment, without regard to whether any time remains in the judicial "term" for which that person had been previously selected.

FACTS

In his verified complaint for declaratory relief Gilbert alleged he is the Presiding Justice of the Second Appellate District, Division Six, and his current term of judicial office ends January 2019. He is contemplating retirement from the court before that date and desires to pursue other opportunities for public employment in state or local government following his retirement. His ability to do so is impaired because of uncertainty surrounding the scope and application of Section 17's provision declaring that a "judge of a court of record" is ineligible for other public office or public employment "during the term for which the judge was selected."

Although no published judicial decision has squarely addressed the issue, Gilbert's complaint acknowledges that other "authorities" have adopted an expansive interpretation of this provision. Such an interpretation would prohibit a judge or justice who has resigned or retired from judicial office from engaging in other public employment before the end of the judicial term he or she could have completed. These other "authorities" include the Attorney General and the Controller, who is identified as being "charged with processing payroll and benefits payments, including retirement benefits, to State employees, including sitting or retired judicial officers."

3

Gilbert alleged this expansive interpretation of Section 17 is incorrect and leads to absurd and arbitrary results. He alleged a controversy has arisen and now exists between him and the Controller as to the meaning of Section 17. He sought a judicial declaration that it applies only to "sitting" judges, and not to those persons who have resigned or retired from judicial office. In the alternative, Gilbert sought a judicial declaration Section 17, if interpreted to preclude judges from engaging in postretirement or postresignation public employment, violates constitutional guarantees of equal protection and due process.

After the Controller unsuccessfully demurred to the complaint – arguing, among other things, that the dispute was not ripe for adjudication because Gilbert had not yet retired or resigned from the judiciary, and had not yet actively sought or been offered other public employment – the matter proceeded to trial.

At trial, the Controller renewed his assertion the dispute was not ripe for adjudication. The trial court rejected that contention, finding Gilbert did have a desire to retire and pursue other public employment before the expiration of his judicial term in 2019, but the uncertainty over whether Section 17 would prohibit such employment before that time, effectively thwarted his ability to do so. The court found the "'imminent hardship' test embraces the notion that legal disputes creating uncertainty and, therefore, the likelihood of repeated litigation should be addressed and resolved expeditiously." Thus, "[i]f there is a possibility that . . . Section 17 is misread by the Controller [then] Gilbert's complaint raises a justiciable controversy that is ripe for judicial resolution." The Controller does not challenge that determination on appeal.

On the merits, the trial court found against Gilbert. It first traced the history of the constitutional provision, noting that, since the earliest days of California, judges have been declared ineligible for other office or public employment "'during the term for which they shall have been elected.'" The court explained that in 1879, a separate constitutional provision was added, declaring "'[n]o judge of a court of record

4

shall practice law in any court of this state during his continuation in office.'"  Then, in 1925, those two provisions were combined into a single section and have continued in that form, with only minor changes, to the present day.

The court then turned to the parties' arguments, setting them forth succinctly:  "Gilbert argues that the 'term' to which he was elected would end were he to retire or resign during the term to which he was elected.  This interpretation would limit the reach of Section 17 to active judges or justices.  The Controller's position is that a 'term' for a justice is a period of time fixed by law that is unaffected by the occupant's decision to leave the office.  A retired justice, under the Controller's interpretation, would remain subject to the limitations imposed by Section 17 for the period of time fixed by statute for the term."  The court explained that it agreed with the Controller's position because the word "term" used in Section 17 should be construed in a manner consistent with the way that same word is used in article VI, section 16 (Section 16) of the California Constitution.  And under Section 16, subdivision (a), an appellate justice's "term" in office is defined by a fixed period of years – that duration is unaffected by whether the incumbent justice resigns or retires at an earlier point.  Instead, when a justice resigns or retires before the end of his or her term, Section 16 provides a new justice will be selected to fill the remainder *of that same term.*

The court also rejected Gilbert's contention Section 17, if interpreted to preclude even *former judges* from engaging in other public office or public employment during the balance of the terms for which they had been selected, would violate equal protection or due process.  The court reasoned the ineligibility rule would actually apply to all judges equally, limiting their eligibility for public office or employment to the terms for which they had been chosen to sit as judges.  The fact some judges might choose to resign or retire from office before the end of their terms, while others did not, did not mean the law itself denied those judges equal protection or due process.

DISCUSSION

*1. The Rule of Necessity Authorizes our Resolution of This Appeal.*

As a general rule, judges are disqualified from deciding cases if they have a financial interest in the subject matter. (Code Civ. Pro., § 170.1, subd. (a)(3)(A).) Because all of the judges on this panel are, at least in the abstract, affected by the provision of Section 17 challenged in this case, we asked the California Supreme Court Committee on Judicial Ethics Opinions to advise us if the rule of necessity authorizes us to decide this case. The committee advised us "[u]nder the 'rule of necessity,' a judge is not precluded from adjudicating a cause because of a disqualifying financial interest if there is no judge or court available to hear and resolve the cause. (*Olson v. Cory* (1980) 27 Cal.3d 532, 537; *People v. Superior Court (Mudge)* (1997) 54 Cal.App.4th 407, 410.) The California Code of Judicial Ethics recognizes the rule of necessity in the Advisory Committee commentary to canon 3E (Cal. Code Jud. Ethics, Advisory Com. commentary following canon 3E). In view of [the] fact that all sitting and retired California appellate justices have an interest in *Gilbert v. Controller of the State of California*, which involves the issue of whether article Vl, section 17, of the California Constitution prohibits judges and justices from accepting any form of public employment during the remainder of their term of office, the rule of necessity applies and the requesting justice is qualified to determine the issues before the justice's appellate panel and author an opinion in the matter."

*2. Standard of Review*

"The principles of constitutional interpretation are similar to those governing statutory construction. In interpreting a constitution's provision, our paramount task is to ascertain the intent of those who enacted it. [Citation.] To determine that intent, we 'look first to the language of the constitutional text, giving the

6

words their ordinary meaning.' [Citation.] If the language is clear, there is no need for construction." (*Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 122; see *Lesher Communications, Inc. v. City of Walnut Creek* (1990) 52 Cal.3d 531, 543 ["Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure . . . and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language"].) However, if there is ambiguity in the language of a measure passed by the voters, "[b]allot summaries and arguments may be considered when determining the voters' intent and understanding of a ballot measure." (*Legislature v. Deukmejian* (1983) 34 Cal.3d 658, 673, fn. 14.)

Further, where, as here, we consider a provision which arguably disqualifies a class of persons – in this case, judges – from eligibility for public office, any ambiguity in the language must be resolved in favor of the class. As explained in *Lungren v. Davis* (1991) 234 Cal.App.3d. 806, 830-831 (*Lungren*), "[d]isqualification from public office is a significant civil disability. [Citation.] The right to hold public office is considered fundamental under the state and federal Constitutions. [Citations.] Accordingly, '[t]he exercise of this right should not be declared prohibited or curtailed except by plain provisions of law. Ambiguities are to be resolved in favor of eligibility to office.'"

Finally, because the trial court's interpretation of Section 17 did not turn on the resolution of any disputed facts, we apply a de novo standard of review. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562.)


*3. The Plain Language of Section 17 Applies Only to Sitting Judges.*

The disputed provision of Section 17 provides, in its entirety: "A judge of a court of record may not practice law and during the term for which the judge was selected is ineligible for public employment or public office other than judicial employment or judicial office, except a judge of a court of record may accept a part-time

7

teaching position that is outside the normal hours of his or her judicial position and that does not interfere with the regular performance of his or her judicial duties while holding office. A judge of a trial court of record may, however, become eligible for election to other public office by taking a leave of absence without pay prior to filing a declaration of candidacy. Acceptance of the public office is a resignation from the office of judge." (Section 17.)

In arguing for their differing interpretations of Section 17, the parties' briefs focused primarily on the meaning of the phrase "the term for which the judge was selected." Gilbert argued his "term" would necessarily come to an end when he resigned or retired, leaving him free to immediately pursue other public employment no matter when that occurred. The Controller argued the "term" of an appellate court justice is defined by a set calendar period and is unaffected by whether the incumbent justice chooses to resign or retire at some earlier point.

But because Section 17, on its face, applies specifically to "a judge of a court of record," and declares only "[a] judge of a court of record . . . is ineligible for public employment or public office" during the term for which that judge was selected, we requested the parties to provide us with supplemental briefs focusing on a different question: i.e., "[d]oes a person who has retired or resigned from judicial office still qualify as a 'judge of a court of record,' as that term is used in [Section 17]?" Amicus curiae, the California Judges Association (the CJA) raised a similar issue by arguing Section 17's reference to "a judge of a court of record" could include only a sitting judge.

Both parties subsequently answered our question by agreeing that, once a person has retired or resigned from a judicial office, he or she *does not qualify* as "a judge of a court of record" for purposes of Section 17.

We agree as well. If the phrase "a judge of a court of record" were construed to include persons who had resigned or retired from the judiciary, then the first clause of Section 17, which states "[a] judge of a court of record may not practice law,"

8

would prohibit such a person from thereafter practicing law. No court or other authority has ever taken that position. And in response to our request for supplemental briefing, the Controller expressly eschewed any such belief. Moreover, if the phrase were not limited to persons who are sitting judges, then section 19 of Article VI, which specifies the Legislature "shall prescribe compensation for judges of courts of record" (Cal. Const., art. VI, § 19) would seem to provide that judges who have resigned from office would nonetheless be entitled to continued compensation. (See *Hayes v. Commission on State Mandates* (1992) 11 Cal.App.4th, 1564, 1595 ["As a general rule and unless the context clearly requires otherwise, we must assume that the meaning of a term or phrase is consistent throughout the entire act or constitutional article of which it is a part"].) If that were true, it would be a significant departure from current practice. It is not. The term "a judge of a court of record" refers only to a sitting judge.

Because the disputed provision of Section 17 renders only "a judge of a court of record" ineligible for other public office or public employment, and that phrase refers only to a *sitting* judge, we conclude this provision is unambiguous on its face. Section 17 renders only a *sitting judge* ineligible for other public office or public employment during the term for which that judge was selected. Thus, it does not prohibit any person who has resigned or retired from a judicial office – as Gilbert contemplates doing – from immediately commencing public service in another capacity. Stated another way, Section 17's prohibition against judges serving in other public capacities is inapplicable to *former* judges.

Of course, notwithstanding the Controller's acknowledgement that a person who has resigned or retired from judicial office would no longer qualify as a judge of a court of record for purposes of Section 17, he nonetheless contends the section must be interpreted as *also* barring a *former judge* from eligibility for other public employment during the remainder of the judicial term the former judge had been serving. The Controller claims this is so because otherwise the phrase "during the term for which the

9

judge was selected" would have no independent meaning. (See *Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 ["'a construction making some words surplusage is to be avoided'"].) We find this assertion unpersuasive for two reasons.

First, once we acknowledge Section 17, on its face, applies only to "judge[s] of court[s] of record," any additional language which suggests persons whom we agree do not fall within that group are nonetheless implicitly bound by the provision, would merely *create ambiguity*. And as we have already explained, we would then be required to resolve any such ambiguity in favor of Gilbert. An ambiguous provision cannot be relied upon to restrict the eligibility of former judges for other public office. (*Lungren, supra*, 234 Cal.App.3d. at pp. 830-831.)

But second, we conclude the Controller is simply incorrect in his assertion the phrase "during the term for which the judge was selected" would be rendered meaningless if Section 17 is construed as applying only to sitting judges. The Controller assumes the phrase merely specifies a time period; i.e., the length of the judge's term. And because all judges presumably "sit" only during their terms, a rule that applies only to sitting judges would also necessarily be limited to the terms for which those judges have been selected to serve.

*Lungren*, however, imbues the phrase "during the term for which the judge was selected" with a wholly different significance. The *Lungren* court simply assumed, without deciding, that Section 17 would prohibit a judge from accepting other public office or public employment, even after leaving judicial office, for the balance of the judge's designated term. (*Lungren, supra,* 234 Cal.App.3d at p. 831, fn. 12 ["If a judge's ineligibility for public office or employment lasts beyond his tenure, then a subsidiary question would be whether the judge's term could be said to end when an elected successor assumes a new term of office. [Citation.] We need not resolve these questions in this case"].) Then after extensive analysis, the *Lungren* court concluded the prohibition, to the extent it exists at all, *did not apply* to a judge who had merely been

*appointed* to fill a vacant judicial seat.  The court reasoned that, instead of specifying *a time frame*, the phrase "during the term for which the judge was selected" actually served to distinguish between *permanent* judges – i.e., those who were serving terms for which they had been selected – and *temporary* judges who had not been selected to serve any "term."  It thus determined Section 17's provision rendering a judge of a court of record ineligible for other public office "during the term for which the judge was selected" did not bind the latter group.

Adopting the *Lungren* court's analysis here, we conclude the phrase "during the term for which the judge was selected" would not be rendered meaningless by our recognition Section 17 applies only to sitting judges.  Section 17 prohibits all sitting judges from practicing law, and also renders permanent, but not temporary, sitting judges ineligible for other public office or public employment.

*4. The Controller's Alternative Interpretation of Section 17 is Unpersuasive.*

Because we concluded the disputed provision of Section 17 is clear on its face, we need not consider the secondary materials or policy arguments relied upon by the Controller to support his differing interpretation.  We nonetheless address them briefly.

The Controller argues Section 17 prevents even former judges from accepting other public employment because the provision is intended, at least in part, to operate as a bulwark against a judge being tempted into trading a favorable judicial decision for the opportunity to advance into some other, more enticing public office.  By preventing judges from commencing any such office until the expiration of their full judicial terms, Section 17 would reduce the opportunity for judicial corruption.  In support of that argument, the Controller cites legislative staff notes which accompanied proposed drafts of the 1965 revision of Section 17.  The staff notes highlighted by the Controller suggest that, allowing judges to be eligible for appointment or election to other

11

office, is "detrimental to the administration of justice," and removing that option eliminates "the possibility of an appointment in return for a decision." But, of course, that concern would apply only to *sitting* judges, not to judges who have already resigned or retired from office

Moreover, as Gilbert points out, there is no indication those staff notes were ever shared with the voters, and thus no basis to infer the concerns expressed could have played any part in determining what *the voters* intended this revised version of Section 17 to accomplish. (*Legislature v. Deukmejian, supra,* 34 Cal.3d at p. 673, fn. 14 [noting that materials *placed before the voters* may be considered in ascertaining voter intent].)

As to the broader public policy argument, we agree with Gilbert's assertion the Controller's interpretation of Section 17 is, at best, an uneasy fit for this anti-corruption policy the Controller argues it is designed to advance. If Section 17 were intended to thwart potential judicial corruption – specifically, the opportunity for a judge to trade a favorable decision for a promised public appointment – it would leave us all wondering why there is comparatively little concern the same judge might also be tempted by a similar offer from a member of the *private sector*. The obvious implication would seem to be that, while members of the private sector are generally assumed to operate with integrity, our judiciary needs special protection from the tempting imprecations of *those other, corrupt, branches of government*. We do not adopt that implication.

Moreover, as Gilbert suggests, if the goal of Section 17 were to shield the judiciary from what would otherwise be a significant temptation to trade judicial decisions for the promise of other public employment, it addresses that concern in a distressingly uneven and at times wholly ineffective way. Under the Controller's interpretation, some judges, if they resigned or retired today, might be precluded from commencing other public office or public employment for perhaps a decade or more. A decade-long exclusion from other public service, following an appellate justice's

12

resignation or retirement from office, would be excessive if the goal were merely to prohibit that judge from jumping directly into another public sector job as a payoff for a favorable decision.

On the other hand, that same interpretation would also allow other judges, who happen to be nearing the ends of their terms, to do *exactly that*. Those judges could leave the judiciary and immediately commence other public employment. It would be as though our Constitution provided that, while judges should be shielded from potentially corrupting public sector employment offers for long stretches of time, they are free to consider such offers during a brief window of time at the end of every six-year term (in the case of trial court judges) or every 12-year term (in the case of appellate justices.) Such an interpretation is senseless.

Instead, as Gilbert notes, if the goal is to prevent judges from trading a judicial decision for a government position, that goal would be best served by simply prohibiting all sitting judges from accepting public office or public employment *for a specified time period* after they have left the judiciary – without regard to whether they have left in the middle or at the end of their designated term. We agree.

Finally, the Controller's attempt to portray Section 17 as an effort to address this one very limited scenario in which judicial corruption might occur is undermined by the comprehensive statutory and regulatory scheme which encompasses this issue. The canons of judicial ethics establishes detailed standards governing judicial ethics across all scenarios, while the Code of Civil Procedure provides mechanisms for disqualifying any judge with a conflict of interest – whether public or private – from presiding over a case. (See Code Civ. Pro., § 170, et seq.) Moreover, our Constitution establishes the Commission on Judicial Performance, which has jurisdiction to discipline judges in the event they engage in ethical misconduct of any kind. (Cal. Const., art. VI §§ 8, 18.) And perhaps most significant, Penal Code sections 93 and 94 make it a crime for a judge to receive or agree to receive a bribe from anyone – public or private – in

13

exchange for a vote, opinion or decision upon any matter, or to ask for or receive any unauthorized gratuity for doing an official act. Thus, any judge who accepted a new position offered in exchange for a favorable decision would be *criminally culpable* for that misconduct even after leaving office, without regard to whether the new job was in the public or the private sector or whether any time remained in the judicial term for which that judge had been selected. In light of this otherwise comprehensive approach to establishing and enforcing standards of judicial ethics, it seems unlikely that Section 17 was intended to *also* address that same issue – especially in such a limited way.

Instead, we conclude the more likely intent behind this disputed provision of Section 17 is to facilitate the *other* public policy, which even the Controller has acknowledged is one of its goals: i.e., *to conserve the time of judges* for the performance of their judicial functions and exclude them from extrajudicial activities that might impair their ability *to perform those functions.* (*Abbott v. McNutt* (1933) 218 Cal. 225, 229 (*Abbott*).)

In fact, the circumstances of *Abbott* are illuminating. That case arose in San Mateo County, after the county's electors had ratified a new county charter in 1932. Among the provisions of that charter was one requiring the county's two superior court judges, or their nominees, sit on a panel to select qualified candidates for the position of County Executive. The two judges of the superior court declined to serve, however, until it was judicially determined to be proper for them to do so.

The Supreme Court concluded it was not proper, relying on former article VI, section 18 of the Constitution, which specified that "'[t]he justices of the Supreme Court and of the District Courts of Appeal and the judges of the superior courts and the municipal courts shall be ineligible to any other office or public employment than a judicial office or employment during the term for which they shall have been elected or appointed.'" (*Abbott, supra,* 218 Cal. at p. 229.) The court noted that "[r]esearch fails to disclose any case construing or applying that portion of the constitutional provision above

14

quoted. However, the purpose and policy underlying such a provision is cogently stated by Justice Cardoza in *In re Richardson*, 247 N.Y. 401 [160 N.E. 655, 661], wherein the following appears: 'The policy is to *conserve the time of the judges for the performance of their work*, and to save them from *the entanglements, at times the partisan suspicions*, so often the result of other and conflicting duties.' In other words, it is intended to exclude *judicial officers* from such extrajudicial activities as may tend to militate against the free, disinterested and impartial exercise *of their judicial functions*." (*Abbott, supra*, 218 Cal. at p. 269, italics added.)

And of course, Section 17's focus on the other branches of government, while ignoring the private sector, makes more sense once we recognize this as the policy behind it. Obviously, members of the private sector could not simply adopt charters or pass legislation which – at least in theory – *compel* members of the judiciary into their service. And whatever voluntary contact our judges might choose to have with members of the private sector, which of course are governed by the canons of judicial ethics, would not give rise to the "partisan suspicions" which seem to lurk in virtually every issue that arises within the public sector. Section 17 rather neatly fends off these potential problems and prevents any blurring of the line between our judiciary and the rest of the government. That is a very important and worthy goal, but one which logically applies *only to the judiciary*. It would serve no purpose to extend these restrictions to persons who have resigned or retired from judicial office and thus no longer perform any judicial functions.

The Controller has additionally relied on a ballot argument made by the California Judges Association (CJA) in support of a 1988 revision to Section 17. The revision was adopted to allow judges to accept part-time teaching positions at public institutions. In its argument, the CJA acknowledged Section 17's general prohibition against judges accepting other public employment "applies during the time the judge is actually in office and during the term for which the judge was selected, even if the judge

15

has resigned part way through the term." The Controller argues this supports his interpretation of Section 17.

But while the CJA statement was submitted to the voters as part of the ballot pamphlet and reflected the CJA's own apparent assumption Section 17 would preclude even retired judges from accepting public employment or office during the balance of their terms, that assumption *was not* the issue placed before the voters. What the voters were asked to do, and did, was *liberalize* Section 17 so as to expressly allow even sitting judges to teach part-time at public institutions. It would require some complicated analytical gymnastics to twist that voter approved *liberalization* of Section 17 into an implicit voter endorsement of its *most restrictive* interpretation. We consequently view the CJA ballot statement as offering no significant support for the Controller's position.

*5. A Contrary Interpretation of Section 17 Leads to Absurd Results.*

Even were we to accept the Contoller's position that this disputed eligibility provision of Section 17 is ambiguous, there is another basis for concluding it could not be interpreted as applying to persons who have resigned or retired from the judiciary, as urged by the Controller. In interpreting a statute (or a Constitutional provision), we are called upon to avoid absurd results. "'Where the language of a statute is reasonably susceptible of two constructions, one which, in application, will render it reasonable, fair and harmonious with its manifest purpose, and another which will be productive of absurd consequences, the former construction will be adopted. In other words, where the meaning is doubtful, any construction which would lead to absurd results should be rejected . . . since absurd results are not supposed to have been contemplated by the legislature.'" (*Aggeler v. Dominguez* (1933) 217 Cal. 429, 434; see *Barber v. Blue* (1966) 65 Cal.2d 185, 188, ["we indulge in a presumption that constitutional and legislative provisions were not intended to produce unreasonable results"].)

16

Gilbert offered several examples of absurd results flowing from the Controller's interpretation of Section 17. He pointed out that the Controller's interpretation would mean two appellate justices who were appointed to the bench on the same day, but to existing 12-year terms that begin and end in different years, could also retire on the *same day*, yet face dramatically different bars to public employment in the wake of retirement. The justice whose term happened to end on the date of their joint retirement could immediately accept public employment, while his or her former colleague whose term happened to extend for an additional 4 or 6 years would be barred from doing so for that same period. There is simply no reason for the different treatment.

Also, a justice would have an unrestricted right to teach at a *private* institution immediately following resignation or retirement, but would not have the same right to teach at a *public* institution for whatever time remained on his or her term – perhaps more than a decade. And a judge or justice could 'practice law' in a private setting immediately following resignation (because, as the Controller explicitly agrees, the bar against practicing law applies only to sitting judges), but the same judge or justice might be prohibited from working as a state lawyer or performing *non-legal* work for any public employer for as long as 12 years. These distinctions serve no purpose.

And finally, the Controller's interpretation would mean that an appellate justice who resigns or retires with time remaining on his her term would be ineligible to run for public office during that time, while Section 17 explicitly allows even a *sitting* trial court judge to do so while merely on a leave of absence. Again, we can discern no possible justification for prohibiting the former while expressly allowing the latter.

Consequently, even if we believed the disputed provision of Section 17 was ambiguous, we would reject the Controller's proposed interpretation on the basis that it leads to absurd results.

*6. Gilbert's Equal Protection and Due Process Arguments Need not be Addressed.*

Because we conclude Section 17 does not preclude Gilbert from pursuing other public office or public employment following his resignation or retirement from the judiciary, even if that occurs before the end of his term, we need not address his contentions that a contrary interpretation would violate his constitutionally protected right to equal protection and due process.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to enter a new judgment declaring Section 17 does not prohibit Gilbert from commencing other public office or public employment immediately following his resignation or retirement from judicial office, even if that resignation or retirement occurs before the end of his current judicial term. Gilbert is to recover his costs on appeal.

**CERTIFIED FOR PUBLICATION**

RYLAARSDAM, ACTING P. J.

WE CONCUR:

MOORE, J.

THOMPSON, J.

18