[No. G032412. Fourth Dist., Div. Three. Mar. 26, 2004.]

COUNTY OF ORANGE et al., Plaintiffs and Appellants, v.
RENEE M. BEZAIRE, as Trustee, etc., et al., Defendants and Respondents.

## COUNSEL

Patton Boggs, Robert D. Luskin; Douglas J. Maloney and Allen A. Haim for Plaintiff and Appellant Webster Guillor, Orange County Tax Assessor.

Steefel, Levitt & Weiss, Harvey L. Leiderman, Jojiro Takano and Jeff C. Nguyen for Plaintiff and Appellant John W. Moorlach, Treasurer-Tax Collector for the County of Orange.

Benjamin P. de Mayo, County Counsel, James C. Harman and Laurie A. Shade, Deputy County Counsel, for Plaintiff and Appellant County of Orange and Orange County Board of Supervisors.

Patrick K. Faulkner, County Counsel (Marin), for California Assessors' Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

John L. Bukey, Richard L. Hamilton and Judith M. Cias for California School Boards Association as Amicus Curiae on behalf of Plaintiffs and Appellants.

Diane F. Boyer-Vine, Marian M. Johnston and Scott A. Baxter for Senate of the State of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Ruth Sorensen for California State Association of Counties and the League of California Cities as Amici Curiae on behalf of Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Lawrence K. Keethe and William L. Carter, Deputy Attorney Generals, for California Department of Finance as Amicus Curiae on behalf of Plaintiffs and Appellants.

Gangloff, Gangloff & Pool, Robert A. Pool, David L. Gangloff, Jr.; Knapp, Petersen & Clarke, Stephen M. Harris; Divelbiss, Divelbiss & Bonzell, Rod Divelbiss and Jonathan Weinberg for Defendants and Respondents.

Patrick G. Woosley, attorney in pro. per., as Amicus Curiae on behalf of Defendants and Respondents.

OPINION

SILLS, P. J.—

## I. INTRODUCTION

█ In this appeal we deal with a technical question within the overall framework of Proposition 13—whether Proposition 13's inflation cap should be calculated based on the original purchase price of the property, or whether it always applies against any intervening previous year's reassessed value. We conclude that the intent of the drafters of Proposition 13, as it was amended in 1978 within six months of its passage by Proposition 8, a measure for which Paul Gann himself co-wrote the ballot argument, is that the inflation factor is calculated against the original purchase price. Indeed, as our Supreme Court pointed out in upholding Proposition 13 in *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208 [149 Cal.Rptr. 239, 583 P.2d 1281], one of the major planks of Proposition 13 was the transition from a fair market value system (in which your property taxes were pegged, if your property was reassessed, to the fair market value of your property) to an original purchase price system. Calculating the inflation cap based on a previous year's reassessed value is fundamentally inconsistent with the system that Proposition 13 put in place.

## II. FACTS

Renee M. Bezaire and Robert A. Pool own a home in Seal Beach which they bought for $330,000 in November 1995. Accordingly, in 1996 the Orange County Assessor "enrolled" the value of the property at that sum.

Like many other properties in California in the 1990's, the Bezaire-Pool property didn't gain any value in 1997, and was enrolled the next year at the same $330,000 value.[1]

Property values did better in 1998, so the Assessor increased the value to $343,332, which is 2 percent for each year for the two years, compounded, based on the original $330,000 purchase price. But $343,332 is *4 percent* more than the *previous year's* assessment of $330,000, with a resulting increase of 4 percent over the previous year's tax bill.

Bezaire and Pool then applied to the county assessment appeals board for a reduction in the 1998 assessment, which would result in a tax refund for

---

[1] This figure was arrived at somewhat more circuitously than we just described. The Assessor first increased the $330,000 by two percent, to arrive at $336,600. But the property wasn't worth that much, so the Assessor then reduced it to $330,000.

them. The board decided in their favor. That is, it reduced the assessment to an amount that was 2 percent over the previous year's, or $333,366.

The *county* then filed a petition for a writ of mandate against the assessment appeals board. (Hence, unlike most property tax cases, the title of this case is the county versus the taxpayer, not the taxpayer versus the county.) In answering the petition, Bezaire and Pool filed a cross-complaint as a class action on behalf of similarly situated taxpayers. (Because we ultimately decide this case on the merits against Bezaire and Pool, we do not address the propriety of the cross-complaint as a class action.)

The case came to trial on a set of stipulated facts. The court ruled in favor of Bezaire and Pool. The trial judge delivered his ruling in a written statement of decision. There, he reasoned that under Proposition 13 "in *no* event" may a property tax increase ever exceed 2 percent over the previous year's. Elaborating, he wrote that the "promise" of Proposition 13 is not just a "long-term limit," but a short-term one as well. That is, "the adjusted tax base will also not exceed 2 % more than the year before." Otherwise, there could be "huge increases from one year to the next in some circumstances as long as the 2 % per year maximum times the number of years limit isn't exceeded." The court later entered a judgment denying the county's petition for a writ of mandate and declaring the so-called recapture method of assessments (i.e., the 2-percent inflation clause in Proposition 13 applies only long term, figured on the initial base purchase price) to be unconstitutional. The county appealed.

## III. DISCUSSION

In determining this appeal, we look at three things. First is the actual text of Proposition 13 as it now stands (that is, as modified by Proposition 8 in 1978). Second is the technical structure of Proposition 13—how the various clauses fit together and what that fit can tell us about the way Proposition 13 is supposed to work. The third is what we can glean historically from the intent of the drafters of Proposition 13 (and Proposition 8, which modified it early on).

### A. *The Bare Text of Proposition 13*

We start, as innumerable cases instruct us to do, with the exact constitutional text at issue. (E.g., *Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 179 [126 Cal.Rptr.2d 727, 56 P.3d 1029] ["First, we turn to the text of the free speech clause . . . ."]; *Thompson v. Department of Corrections* (2001) 25 Cal.4th 117, 122 [105 Cal.Rptr.2d 46, 18 P.3d 1198] ["In interpreting a constitution's provision, our paramount task is to ascertain

the intent of those who enacted it. . . . To determine that intent, we 'look first to the language of the constitutional text, giving the words their ordinary meaning' "]; *Leone v. Medical Board* (2000) 22 Cal.4th 660, 665 [94 Cal.Rptr.2d 61, 995 P.2d 191] [source of previous quote]; see also *Armstrong v. County of San Mateo* (1983) 146 Cal.App.3d 597, 610 [194 Cal.Rptr. 294] [in a case construing the inflation clause of Proposition 13, beginning with the question of whether the "meaning of the constitutional language" was clear or uncertain].)

Here is the subject text as it currently reads: "The full cash value base may reflect from year to year the inflationary rate not to exceed 2 percent for any given year or reduction as shown in the consumer price index or comparable data for the area under taxing jurisdiction, or may be reduced to reflect substantial damage, destruction or other factors causing a decline in value."

■ Let us begin by acknowledging that this language is capable of more than one meaning and therefore ambiguous. That's not surprising: In the case where the California Supreme Court originally upheld Proposition 13 against a constitutional attack, *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization, supra,* 22 Cal.3d 208, our high court specifically noted that some provisions of Proposition 13 were, in fact, ambiguous. (See *Amador Valley,* at p. 245 ["Acknowledging as we must that article XIII A in a number of particulars is imprecise and ambiguous. . . ."].) Indeed, in another context (the time when Proposition 13's inflation factor was to commence, either 1975 or 1978), a court has already held *this specific clause* to be ambiguous.[2]

---

[2] In *Armstrong v. County of San Mateo, supra,* 146 Cal.App.3d 597, the Court of Appeal had to determine whether the inflation clause from article XIII A, section 2, subdivision (b) would begin in 1978, when the relevant language was passed by the electorate, or would begin in 1975, which was the date that to which assessments had generally been rolled back. The difference, of course, was whether property owners got to start, in 1978, with the (presumably) lower 1975 assessment, or whether they had to start with the 1975 figure, then had that figure adjusted (upward) by two percent for each year in the interim. Put another way, was the inflation factor to be applied before, or, alternatively, not until the effective date of Prop 13? (See *Armstrong,* at p. 608.)

As it turned out, Howard Jarvis and Paul Gann *themselves* had never discussed the commencement date of the inflation factor during the campaign for Proposition 13. (*Armstrong v. County of San Mateo, supra,* 146 Cal.App.3d at pp. 607–608.) In fact, the two of them gave conflicting trial testimony on the point: Jarvis thought that the inflation factor could be applied to raise the 1975 base year value as of 1978, while Gann thought 1975 values should be used without three years of inflation adjustments. (*Id.* at p. 619, fn. 15.)

The court concluded that, "insofar" as the text related to the time when the inflation clause would commence, "the article was ambiguous." (*Armstrong, supra,* 146 Cal.App.3d at p. 614.) Given that ambiguity, and given that the interpretation adopted by the Legislature and the State Board of Equalization was not unreasonable, while the opposite approach lead to "disparities in tax treatment and other inequities that faithful adherence to the basic precepts" of

There are two ways that this language can be read. If you read "may" for "shall not under any circumstances"—and sometimes, particularly in colloquial usage "may" does mean that, e.g., parent to child: "no, you may not go to the concert, you've been grounded for the week"—and if you assume that "not to exceed 2 percent for any given year" implies "not to exceed 2 percent over the previous year"—then, yes, you can read the text the way the trial court did, that is, an absolute limit of 2 percent figured against the previous year.

The second way is to read it to mean that the "full cash value base" is limited to annual increases of 2 percent, and *look elsewhere* for exactly when that base is established, which could have been some years earlier. That "elsewhere" is in the previous subdivision of the same section of article XIII A (i.e., subdivision (a) of section 2 as distinct from subdivision (b)). And there you discover that the "full cash value" base is established by the value on the 1975–1976 tax bill, or at the time of purchase, or when there is genuine new construction (as distinct from mere reconstruction). But there is no reference in the definition of the base to any declines in value.

There are two serious problems with the first interpretation. Let's start with the less obvious one. The short-term interpretation necessarily reads the word "given"—as in "not to exceed 2 percent for any given year or reduction"—to include an implied reference to what is not there, i.e., a *previous* year if there was a reassessment. If this interpretation is to hold water, there should be some reference to such a previous reassessed value. There isn't.

Now consider the importance of the interpretation of the question of exactly when the full cash value is established. If the idea were to limit the taxes in any one year to no more than the taxes in the previous year (assuming, of course, that there had been a reassessment since the original purchase), there would be a simple way to do it. Use the word "previous" or "reassessed" in such a way that the reader is clear that, if there ever is reassessment reflecting a reduction in the full cash value base because of a decline in fair market value, the next year's base is figured on the previous year's base.

The omission of such words is thus itself significant. It leaves a gaping hole pointing in the direction that the drafters of the inflation cap weren't thinking in terms of limiting base increases to 2 percent over the previous year, but in terms of the original establishment of the base at time of acquisition. And given the importance of the omission, the presumption is that the omission was deliberate. It would therefore be error for a court to select an interpretation which inserted the words "previous" or "reassessed value of the year before" into the text where they had been

Proposition 13 did not require (*id.* at p. 616), the court ultimately sided with Howard Jarvis's interpretation of when the inflation factor would commence.

deliberately omitted. (See *Ross v. City of Long Beach* (1944) 24 Cal.2d 258, 260 [148 P.2d 649] ["To insert these suggested words into this section of the Constitution would give it an added meaning not to be found in the definite language of the section as adopted by the people."]; *People v. Campbell* (1902) 138 Cal. 11, 15 [70 P. 918] ["The constitution is to be interpreted by the language in which it is written, and courts are no more at liberty to add provisions to what is therein declared in definite language than they are to disregard any of its express provisions."].)

The more obvious reason is the little word "may" in the opening sentence.

"May" is not at all the word you would use if you were serious about absolutely limiting nominal increases in property taxes to 2 percent over the previous year, regardless of whether the previous year's taxes were the result of some temporary event reflected in a downward reassessment. You'd say *shall.*

■ Generally speaking, of course, the word "may" is permissive—you can do it if you want, but you aren't being forced to—while the word "shall" is mandatory—no way you can do it. (See, e.g., *Woodbury v. Brown-Dempsey* (2003) 108 Cal.App.4th 421, 433 [134 Cal.Rptr.2d 124] ["Ordinarily, the word 'may' connotes a discretionary or permissive act; the word 'shall' connotes a mandatory or directory duty."]; *Decker v. U.D. Registry, Inc.* (2003) 105 Cal.App.4th 1382, 1389 [129 Cal.Rptr.2d 892] [generally explaining that "may" is discretionary, "shall" is mandatory]; see also *Dean v. Kuchel* (1951) 37 Cal.2d 97, 101–102 [230 P.2d 811] ["The word 'may' is at least reasonably susceptible of a permissive meaning rather than mandatory or prohibitory . . . ."].)

■ While there are times when "may" has more stick in it than it ordinarily has—the "no, you may not do that" sorts of usages—when it is *contrasted* in the same usage with "shall," it takes its usual, more permissive meaning. And here it is indeed contrasted with "shall." In the critical section of Proposition 13 that limits property taxes to 1 percent (article XIII A, section 1, subdivision (a), "The maximum amount . . . shall not exceed One percent"), the word "shall" *is* used. And because of that contrast, we must conclude that the drafters of article XIII A, section 2, subdivision (b) meant the word "may" in a permissive sense. (See *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443 [261 Cal.Rptr. 574, 777 P.2d 610] ["may" is permissive and "shall" is mandatory "particularly when both terms are used in the same statute"]; see also *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117 [81 Cal.Rptr.2d 471, 969 P.2d 564] ["Where different words or phrases are used in the same connection in different parts of a statute, it is presumed the Legislature intended a different meaning."])

Why use a permissive "may" instead of a mandatory "shall"? That will become very clear in the section of this opinion where we discuss the intent of the drafters of the inflation cap. For the moment, suppose you want to have a system where taxes can go down or stay the same because of an intervening reassessment in light of something unexpected, like a fire, or perhaps even merely because (as in the case before us), fair market values decline or stagnate for a period of time. But suppose also that you want to have a system where if property values *recovered*, taxes could go up again, all the time subject to the inflation cap without a formal reassessment. If that is what you wanted, you'd say "may," to give assessors flexibility. And that is precisely what we have here. By using "may," the drafters of the inflation cap underscored the idea that adjustments in the base for declines in fair market value were temporary.

The *temporary* nature of any reassessment for a decline in value cannot be overstressed. *By definition, the problem we deal with in the case before us involves only such temporary declines.*

If, for some reason, your house declines in value and, after reassessment, its value *stays there*, there is no argument. Under Proposition 13, assessments cannot be any *higher* than a property's fair market value. (See *Metropolitan Culinary Services, Inc. v. County of Los Angeles* (1998) 61 Cal.App.4th 935, 939 [71 Cal.Rptr.2d 859] [under Proposition 13, taxes are limited to *either* "the lower of fair market value or 'base year value' "].)

■ As between two alternative interpretations of language, courts prefer the interpretation which is the more natural and logical. (See *Bay Cities Paving & Grading, Inc. v. Lawyer's Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263]; *Manneck v. Lawyers Title Ins. Corp.* (1994) 28 Cal.App.4th 1294, 1301–1302 [33 Cal.Rptr.2d 771]; *In re Marriage of Smith & Maescher* (1993) 21 Cal.App.4th 100, 109 [26 Cal.Rptr.2d 133]; *Troughton v. Eakle* (1922) 58 Cal.App. 161, 173 [208 P. 161]; *Estate of Dubois* (1949) 94 Cal.App.2d 838, 842 [211 P.2d 895]); *In re Navarro* (1946) 77 Cal.App.2d 500, 507 [175 P.2d 896].) We therefore conclude that, of the two possible interpretations, reading the inflation cap to apply to the original acquisition cost base (or new construction when that really does occur), rather than a base calculated on any intervening downward reassessment, is the more logical and natural, and therefore the one courts must prefer.

Our conclusion is reinforced by the way in which our Supreme Court has had incidental occasion to describe the operation of the inflation cap. While those descriptions are not dispositive (they were descriptions in passing of

how Proposition 13 works), they show that someone just reading the language of the inflation cap would not necessarily come to the conclusion which the trial court did.

In the *Amador Valley* decision, the court observed that "Subdivision (b) permits a maximum 2 percent annual increase in 'the fair market value *base*' of real property to reflect the inflationary rate." (*Amador Valley, supra,* 22 Cal.3d at p. 220, italics added.) Those words (note the general reference "to the inflationary rate" as distinct from something like "increase over the previous year") indicate that the description is of a long-term cap, not of a year-to-year cap.

The same observation was made later in the opinion. The court had occasion to parenthetically paraphrase the operation of the inflation clause after quoting another part of Proposition 13 verbatim (article XIII A, section 2, subdivision (a)) . In those parentheses the court again described the operation of the clause in terms of an overall, long-term cap, not a short-term, year-to-year-regardless cap: "(§ 2, subd. (b), permits an annual 2 percent maximum increase on the 'fair market value base' of property, to reflect the inflationary rate.)" (*Amador Valley, supra,* 22 Cal.3d at p. 233.)

Our high court also read the inflation cap language the same way in *City and County of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554 [41 Cal.Rptr.2d 888, 896 P.2d 181]. That case involved the relatively abstruse question of whether Proposition 13 applies to property which is itself owned by a city, but outside of the city's territorial jurisdiction. (Think of Los Angeles owning land near Mono Lake as part of its water system.) First it said, "It [meaning Proposition 13] limits the valuation of real property owned since the 1975 assessment date to the 1975–1976 'full cash value' of the property, increased for inflation by a maximum of 2 percent annually." (*City and County of San Francisco v. County of San Mateo, supra,* 10 Cal.4th at p. 561.)

Five pages later the court was even plainer in reading the inflation factor clause to apply to an original base, and not any intervening previous year: "Under article XIII A, the only time full cash value equals fair market value is in the year when real property subject to appraisal at fair market value is first purchased, newly constructed, or otherwise changes ownership. *Thereafter, the full cash value of the property increases according to the rate of inflation* (to a maximum of 2 percent per year), and not according to the increase in fair market value." (*City and County of San Francisco v. County of San Mateo, supra,* 10 Cal.4th at p. 566, italics added.)

While these comments from the high court's cases are not dispositive in themselves, they do conclusively refute Bezaire and Pool's argument that the

language of inflation cap *requires* a year-to-year interpretation. Seven justices of our Supreme Court, just reading the language for the purpose of a general description of how Proposition 13 works, didn't find the Bezaire and Pool's interpretation so obvious that they couldn't come up with a description incongruous with that interpretation. And in fact, as we have shown, the Supreme Court merely read the language as it more naturally reads, i.e., not requiring a year-to-year cap or calculating the inflation base from an intervening downward reassessment.

## B. *The Structure of the Text*

Now we examine the legal framework into which the bare text is placed. It also points in the direction of a long-term inflation cap based on the original purchase price.

When Proposition 13 was approved in June 1978, property taxes were governed by article XIII of our state Constitution. Article XIII provided for a fair market value system of property taxation which basically meant that property taxes went up as the value of your property went up (if you were the target of a reassessment). Section 1 of article XIII simply provided that "All property is taxable and shall be assessed at the same percentage of fair market value."

Thus, prior to Proposition 13, property taxes could fluctuate directly with fair market value. In a period of general property inflation, such as marked the late 1970's, that meant property owners faced dramatically escalating property taxes. (See *Metropolitan Culinary Services, Inc. v. County of Los Angeles, supra,* 61 Cal.App.4th 935, 939 ["In 1978, the California electorate enacted Proposition 13 (Cal. Const., article XIII A) in an effort to place a brake on what was becoming an unaffordable annual upward spiral in property tax assessment."].)

Proposition 13 added article XIII A to the California Constitution.[3] Whatever else Proposition 13 did, it is safe to say it did at least these three things to change the legal structure of property taxation in California:

---

[3] Proposition 13 didn't purport to repeal article XIII, though it certainly altered the operation of the sentence in article XIII providing that all property must be assessed at fair market value. In *State Bd. of Equalization v. Board of Supervisors* (1980) 105 Cal.App.3d 813, 822 [164 Cal.Rptr. 739], in a case involving the distribution of property tax revenues, the court remarked that "Proposition 13 did not repeal or in any way alter the provisions of article XIII." Another panel of the Court of Appeal, in *City of Rancho Cucamonga v. Mackzum* (1991) 228 Cal.App.3d 929, 939, footnote 10 [46 Cal.Rptr.2d 448], found that remark too "sweeping." For what it is worth, the *Mackzum* court obviously is correct. If Proposition 13 had not " 'in any way alter[ed]' " article XIII, Californians would still be living with a property tax system pegged simply to fluctuations in fair market value. And we know that is not the case. (See *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization, supra,* 22 Cal.3d at p. 236 [noting that Proposition 13 converted California "from a current value to an acquisition value system"].)

First, Proposition 13 placed a 1 percent *limit* on property taxes. The "tax limit" provision is contained in section 1 of article XIII A, which provides in pertinent part: "The maximum amount of any ad valorum tax on real property shall not exceed One percent (1%) of the full cash value of such property."

Second, Proposition 13 rolled back the *base* on which taxes were to be figured. In sum, that base was to be the valuation as shown on the 1975–1976 property tax bill, and afterwards it would be the "appraised value" of the property "when purchased, newly constructed, or a change in ownership has occurred." This definition of "base" is contained in section 2 of article XIII A, subdivision (a). In pertinent part it provides: "The full cash value means the county assessor's valuation of real property as shown on the 1975–1976 tax bill under 'full cash value' or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment."

Third, Proposition 13 restricted the *growth* in the assessed value of property subject to taxation. Like the definition of base, the "growth" restriction provision appears in section 2 of article XIII A, except this time in subdivision (b) instead of subdivision (a). Proposition 8 modified subdivision (b) just a few short months after Proposition 13's June 1978 enactment. We have already quoted the language put into Proposition 13 by Proposition 8.

It is important to note the interplay of these sections. Taxes are directly limited in one section, the base is defined in another, and the inflation cap is found in yet another.

This segregation of ideas into their respective subdivisions is itself important. By defining the base in one section to be established at the time of acquisition or new construction, but setting forth the inflation factor and the possibility of reductions in value in another, the message emerges that reassessments for reductions in value do not affect the original base. After all, reductions in value are only mentioned in the section dealing with the inflation cap, not the section dealing with the definition of the base. One is led to the conclusion that the base remains established at the time of acquisition or new construction; a new base is not established merely because of a temporary dip in fair market value.

## C. *Intent of the Drafters*

As much as it is possible to ascertain the intent of the drafters of the inflation cap, the idea was to have it track the base, and not any intervening year when there is a downward reassessment.

When the original Proposition 13 was crafted in the late 1970's, general property deflation was unknown. Property values went up. Then they went up some more. Then they went up again.

So Proposition 13, as originally drafted, overlooked the possibility of a decline in property values. In fact, Chief Justice Bird, as lone dissenter in *Amador Valley*, made a rhetorical point about the omission of the possibility of declines in value to attack the whole "acquisition date valuation" system which her colleagues had found reasonable. She said, "Finally, the arbitrariness of the acquisition date valuation as a tax standard can be demonstrated by considering the plight of the taxpayer whose property has actually *decreased* in value since 1975. Under the previous tax system, such a person's property tax assessment would eventually reflect the decline in market value. However, under article XIIIA"—and here we must point out that she is referring to Proposition 13 as originally written—"the assessment remains fixed at the acquisition date value since section 2(b) allows for a reduction in assessment only on the basis of a downward turn in the consumer price index." (*Amador Valley, supra*, 22 Cal.3d at p. 255 (conc. & dis. opn. of Bird, C. J., original italics).)

Chief Justice Bird did acknowledge, however, that efforts were underway to correct the situation to account for declines in value. She noted that a proposed constitutional amendment had already been prepared to "remedy this anomalous situation" and was awaiting "vote of the people." (*Amador Valley, supra*, 22 Cal.3d at p. 253, fn. 1 (conc. & dis. opn. of Bird, C. J.).)

The proposed amendment to which Chief Justice Bird referred was Proposition 8, which would pass in just a few months after she penned her dissent in *Amador Valley*. Proposition 8 gave us the inflation cap in article XIII A, section 2, subdivision (b), in its current form.

The immediate provocation for the amendment was the plight of victims of a major fire in Santa Barbara in 1977. Remember that Proposition 13 as originally drafted rolled back assessments to those on the 1975–1976 tax bill. So what did that mean for people who lost their homes in a major fire in 1977? Were they stuck with paying property taxes on 1975–1976 values, when there *was* a home on their land? Surprisingly, the answer was yes under Proposition 13 as originally written. Something had to be done and that something was Proposition 8.

If Proposition 13 had itself been controversial, Proposition 8, the amendment to take care of victims of disasters, was very *non*controversial. There wasn't a single vote in either house of the Legislature against it. No ballot argument was submitted against it. It went to the electorate unopposed.

The ballot argument in its favor was authored by Paul Gann and two state senators. It acknowledged the need for Proposition 8 because of the omission in Proposition 13 to account for actual declines in property value. Here is what Gann and his two fellow authors wrote: "Although Proposition 13 rolled back assessments to 1975–1976 values, it overlooked the possibility that a person's property might have been damaged to the extent that it has actually *declined* in value since 1976. Proposition 8 on this ballot would allow assessors to further reduce assessments if such damage has, in fact, occurred." (Original italics.)

The emphasis on a mechanism to cope with the effects of disaster and damage[4] was then illustrated in the next four paragraphs of the ballot argument (and there were only five more paragraphs to go), which specifically referred to disaster victims.[5]

The ballot argument for Proposition 8 addressed the long-term versus short-term issue, but only inferentially: That is, by stressing that it was motivated as a *disaster relief effort*, it implied that *any decline in the base was to be short term*, not long term and, hence, the inflation cap would be figured on the original base, and not any temporarily reduced base. It was obviously assumed that when houses burn down, people rebuild them.

---

[4] It is interesting to note that while this ballot argument was concerned with an amendment to account for declines in price, there is no hint in that statement of actual price *deflation*. There are only references to *damaged* property. Deflation, buried in "other factors causing a decline in value" appears strictly as an afterthought.

[5] Here are those four paragraphs, verbatim. Again, note the focus on disaster and almost total disregard of the possibility of widespread price deflation:

"Moreover, some California families have recently been the victims of large-scale disasters, officially recognized as state emergencies. To cite but one example, more than 200 families saw their homes completely destroyed by fire in Santa Barbara in 1977, and other Californians have suffered similarly from extensive floods, mudslides, and earthquakes.

"But when these victims of disasters rebuild their homes or businesses, they come under the provision of Proposition 13 which requires that 'new construction' be assessed at current market value, thus causing a major reassessment *upward*. Without Proposition 8, those who cannot afford to rebuild at all presumably will still have to pay the 1975–76 assessed value of the home or business as though it were still standing.

"So, although the 'new construction' provision will generally be appropriate, for disaster victims forced to rebuild it is terribly unfair. Proposition 8 simply says that these unfortunate citizens should be allowed the same 1975–76 rollback that the rest of us receive, on condition that the new structure is comparable in value to the one being replaced.

"Again, in keeping with the spirit and intent of Proposition 13, Proposition 8 will allow assessors to *reduce* assessments to reflect substantial damage, destruction or other factors which cause a decline in property value. This will insure equal treatment under the law, and will prevent additional tax burdens from falling on those who have suffered major property losses, damage or property depreciation since 1976."

Our conclusion is confirmed by the impartial analysis prepared by the Legislative Analyst that was part of the ballot materials concerning Proposition 8. (See *Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537, 582 [101 Cal.Rptr.2d 653, 12 P.3d 1068] (conc. & dis. opn. of George, C. J.) [the Legislative Analyst's analysis is "the item in the ballot pamphlet materials that voters are most likely to have viewed as objective and impartial and to have consulted as a reliable indicator of the proposition's meaning and effect"].) The analysis by the Legislative Analyst also indicates that the inflation cap in Proposition 8 was to be long term, and conversely the decline in base value contemplated by the measure was to be short term.

For the Legislative Analyst, the motivating force behind Proposition 8 was to prevent the insult of higher property taxes added to the injury of losing your home. Specifically, his analysis reveals that the focus of Proposition 8 was to prevent a newly rebuilt house from being reassessed *anew* at its *fair market value*. Here is what the Legislative Analyst said: "This proposal specifies that real property which is reconstructed after a disaster shall not be reassessed at its new market value if (1) it is in a disaster area, as proclaimed by the Governor and (2) its value is comparable to the fair market value of the original property prior to the disaster. This would prevent the assessed value of such property from being increased by more than the 2 percent annual inflation factor."

The Analyst had this to say about property which had declined in value since 1975: "Proposition 13 does not allow the assessor to reduce the assessed value of property which declines in value while it is still owned by the same taxpayer. This proposal would allow the assessor to make such reductions when it has been substantially damaged or its value has been reduced by 'other factors' such as economic conditions."

If the drafters of Proposition 8 had provided for a permanently lowered base when the property was reassessed downward because of a disaster, logically the Legislative Analyst would have pointed it out. He didn't. Rather, the Analyst told the voters that there would be no new establishment of the base after reconstruction. The link is to the original acquisition base—note the reference to the reconstructed property being of value "comparable to its fair market value prior to the disaster"—would remain. It would be nonsensical to make that statement if the base was to be permanently lowered to the level the property had when it had no house on it at all.

## VI. Conclusion

To recap: The more natural reading of article XIII A, section 2, subdivision (b) is that the base on which the inflation factor is figured

remains that of the original purchase price (or assessment at time of genuine new construction), not any reduced base resulting from a reasssessment in the wake of a decline in property values, such as might happen with a general deflation or a disaster. The structure of the constitutional language, and the intent of its drafters, also point in the same direction.

Accordingly, we conclude that the trial court erred in ruling that assessments are always limited to no more than 2 percent of the previous year's assessment. The judgment is reversed, and the cause returned to the trial court with directions to enter judgment in favor of the county in its petition for writ of mandate.

The interests of justice, however, favor that both sides shall bear their own costs in this appeal.

O'Leary, J., and Moore, J., concurred.

Respondents' petition for review by the Supreme Court was denied July 21, 2004. Kennard, J., and Baxter, J., were of the opinion that the petition should be granted.