Filed 12/3/13 Chambi v. WMC-SA CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| ISRAEL P. CHAMBI, | |
| Plaintiff and Appellant, | G046922 |
| v. | (Super. Ct. No. 30-2009-00122960) |
| WMC-SA, INC. et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Kirk H. Nakamura, Judge. Affirmed.

Law Offices of William J. Kopeny and William J. Kopeny for Plaintiff and Appellant.

Horvitz & Levy, David M. Axelrad, S. Thomas Todd; Fenigstein & Kaufman, Ron S. Kaufman, Sara McDuffie; Law Offices of James R. Lahana and James R. Lahana for Defendants and Respondents.

\*          \*          \*

In this appeal we determine:

(1) The provision in Business and Professions Code section 809.2, subdivision (a), requiring the presence of a member of a physician's own specialty in any peer review hearing "where feasible," is mandatory, not permissive.[1]

(2) The feasibility of having a fellow specialist present in any peer review hearing includes consideration of the economic cost of procuring such a specialist.

(3) The hospital bringing charges against a physician must pay for the specialist if he or she comes from outside the hospital staff, and also bears the burden of showing that the economic cost of procuring a fellow specialist for a peer review hearing is prohibitive.

(4) In this case, defendant hospital, Western Medical Center, did not bear its burden of showing that the cost of having a fellow neurosurgeon on the peer review panel charged with adjudicating charges against plaintiff Dr. Israel Chambi was prohibitive.

(5) However, Dr. Chambi has failed to carry his own burden *on appeal* of showing that Western Medical's failure to honor his request to have a fellow neurosurgeon on the peer review panel was itself prejudicial so as to require reversal of the judgment against him in this case. Consequently, we affirm that judgment.

## I. FACTS

Dr. Israel Chambi had privileges as a neurosurgeon at Western Medical Center in Santa Ana.[2] In 2003 charges were brought against him for substandard medical care, generally consisting of either (1) operating where not necessary in a number of

---

[1] All statutory references in this opinion will be to the Business and Professions Code. All otherwise undesignated references to any subdivision of a statute will be to section 809.2 of that code.

[2] Technically known as "WMC-SA" in the complaint. Most residents of Orange County know the hospital as Western Medical Center, so we will refer to it as Western Medical in this opinion.

2

cases or (2) errors in technique in a number of cases.[3]  There is no question that Dr. Chambi timely requested the presence of a fellow neurosurgeon on the peer review panel, which was to consist of five members.  The request was rejected, however, because all the neurosurgeons on Western Medical's staff would have been biased, one way or the other, and the medical staff thought it was too expensive to go outside Western Medical to procure the services of an outside neurosurgeon for the purpose.  The peer review panel rendered its decision in 2007, recommending termination of Dr. Chambi's privileges.[4]  Later in 2007 the hospital's governing board adopted the panel's recommendation and the decision to terminate privileges became final.  There is no question Dr. Chambi exhausted his administrative remedies.

Dr. Chambi filed this case in May 2009, seeking a petition for administrative mandate to invalidate the decision and reinstate his staff privileges at the hospital.  Among other issues, the petition complained about the lack of a neurosurgeon on the peer review panel.  The trial court heard the matter in the Spring of 2012 and denied the petition.  Dr. Chambi filed a timely notice of appeal and presents basically but one claim of error:  that the lack of a fellow neurosurgeon on the peer review panel deprived him of a fair hearing.

---

[3]     The question of exactly how many cases there were in which Western Medical might have charged Dr. Chambi with having been guilty of substandard practice is immaterial to this appeal.  Dr. Chambi's brief emphasizes the number of charges involved less than 16 patients, and the charges were sustained as to less than half of those.  The record shows Western Medical's initial charges involved about 30 patients, and the charges basically consisted of Dr. Chambi having too often chosen surgery when not called for (his operation rate was 150 percent of fellow neurosurgeons), errors in technique leading to brain infarction and hemorrhage, and failure to obtain postoperative angiograms.  However, it appears that Western Medical reduced the charges to 16 patients in the interest of expediting the hearing.  (There was a 17th charge – for not disclosing a previous suspension from UC Irvine in 1995 and termination from its faculty.)

[4]     The panel's decision is complete with a judicial-style caption entitled "In re:  The Medical Staff Membership and Privileges of Israel Chambi, M.D."and reads like a statement of decision in the trial court.  Superficially at least, the decision appears fair and balanced.  For example, it agreed with Dr. Chambi that it needed to be proven that a given surgery was not necessary.  "Simply being aggressive is not seen as a vice."  The panel further recognized that "unless risky, low probability of success surgery is nevertheless performed, patients and malpractice plaintiffs may claim that not every possible action was taken by the surgeon."

However, the panel's decision is undated.  We take Dr. Chambi's brief's word for it that it was rendered in February 2007.

3

## II. DISCUSSION

A. *Section 809.2, Subdivision (a)'s Requirement of*
*a Fellow Specialist Where Feasible is Mandatory*

In California, hospital bylaws involving the termination of physicians' privileges must implement Business and Professions Code sections 809 to 809.8. (See § 809, subd. (a)(8); *Unnamed Physician v. Board of Trustees* (2001) 93 Cal.App.4th 607, 617.) These statutes set out minimum standards of procedural protections for physicians. (*Id*. at pp. 622-623.) In the case before us, Western Medical's bylaws (specifically section 8.3.5) contain the same "where feasible" language contained in section 809.2, so we will treat the specialization clause of the hospital's bylaws as synonymous with the statute.[5]

The record contains a letter from the hospital's lawyer to Dr. Chambi's lawyer rejecting his request for a fellow neurosurgeon on his peer review panel because the requirement of a fellow specialist was "permissive in nature and not mandatory." We reject that position. The "shall" language and syntax of section 809.2, subdivision (a) admits of no other reading but that the requirement – to be sure, qualified by the "where feasible" language – is mandatory. The text reads: "*If* a licentiate timely requests a hearing concerning a final proposed action for which a report is required to be filed under Section 805, the following *shall* apply: [¶] (a) The hearing shall be held, as determined by the peer review body, before a trier of fact, which shall be an arbitrator or arbitrators selected by a process mutually acceptable to the licentiate and the peer review body, or before a panel of unbiased individuals who shall gain no direct financial benefit from the

---

[5]    Bylaw 8.3.5 provides: "Membership on a judicial review committee shall consist of one member who shall have the same healing arts licensure as the accused, *and where feasible, include an individual practicing the same specialty as the member*." (Italics added.) Compare that with this sentence of subdivision (a) of section 809.2: "The hearing shall be held, as determined by the peer review body, before a trier of fact, which shall be an arbitrator or arbitrators selected by a process mutually acceptable to the licentiate and the peer review body, or before a panel of unbiased individuals who shall gain no direct financial benefit from the outcome, who have not acted as an accuser, investigator, factfinder, or initial decisionmaker in the same matter, and *which shall include, where feasible, an individual practicing the same specialty as the licentiate*." (Italics added.)

4

outcome, who have not acted as an accuser, investigator, factfinder, or initial decisionmaker in the same matter, and which *shall include*, where feasible, an individual practicing the same specialty as the licentiate." (Italics added.) All those "shalls" make it clear a hospital has no option to treat the requirement of a fellow specialist where feasible as anything but mandatory. (See *County of Orange v. Bezaire* (2004) 117 Cal.App.4th 121, 129 [generally discussing difference in meaning between shall and may].)

B. *Feasibility Includes Economic Prohibitiveness*

Dr. Chambi argues in this appeal that the word "feasible" simply means "capable of being done," suggesting that economic feasibility should not enter into the analysis of feasibility.[6] Dr. Chambi points to fragments of the legislative history leading to the enactment of section 809.2, which show that, at one stage in the legislative process, the words "financially and operationally feasible" were present in the proposed statute. On its face this legislative history is incomplete, and it sheds no light on such questions as to why one draft of the bill might have had the words "financially feasible" in it, or why those words were eventually deleted.

In any event, Dr. Chambi's argument is unavailing. A change from "where financially and operationally feasible" to "where feasible" does not, absent more (and nothing more is provided in this case) *clearly* show a legislative intention to impose on hospitals a requirement to procure specialists for peer review panels regardless of price. (See *J.A. Jones Construction Co. v. Superior Court* (1994) 27 Cal.App.4th 1568, 1578-1579 [need for "clear statement of intent" to rely on legislative history].) Dr. Chambi's hoped-for reading runs contrary to what *did* make it into the statute, because to read

_____

6  Dr. Chambi cites *Morris v. Williams* (1967) 67 Cal.2d 733, 757 for the definition. Though *Morris* did observe, in the context of Medicare cuts, that "'Feasible' . . . means capable of being done," it quickly added the tag line, "and capable of producing a saving in a manner not otherwise barred by the statute," making the case of only limited value to our analysis. We don't deal with a Medicare statute here.

5

"where feasible" to categorically exclude economic factors would be, in effect, to read the entire idea of feasibility out of the statute.

As Justice Poche once wrote in an easement case (involving the question as to whether residential construction on certain landlocked property was "feasible"), "Economic feasibility . . . is in the eye of the potential owner."[7] (*Roemer v. Pappas* (1988) 203 Cal.App.3d 201, 210 (conc. opn. of Poche, J.)  Almost *anything* is "capable of being done" if enough economic resources are thrown at it.

Case law, of course, interprets the word feasible to include economic factors.  (See *Lopez v. Nissan North America, Inc.* (2011) 201 Cal.App.4th 572, 582-583 ["The word 'practicable' . . . is synonymous with 'feasible' and allows for reasonable limitations, including economic, practical, and technical limits"]; *County of Los Angeles v. Fairmont Specialty Group* (2009) 173 Cal.App.4th 538, 545, fn. 3 [upholding trial court's determination that it was not 'feasible' to obtain extradition of defendant, even if it might be 'possible,' and drawing distinction between meaning of 'possible' and 'practicable'"].)  The cases represent a common sense reading of the word – one from which we see no reason to depart.

C. *The Hospital Bears the Burden of Establishing*
*Procurement of a Fellow Specialist is Cost Prohibitive*

Both sides have briefed this case on the assumption it is the hospital who would have had to foot the bill to have provided a fellow neurosurgeon on Dr. Chambi's peer review panel.  That assumption is correct.  We must discuss the matter, though, because it is logically antecedent to tackling the problem of whether Western Medical did, indeed, show that procuring a neurosurgeon for Dr. Chambi's panel was not feasible.

---

[7] To the degree the *Roemer* decision itself opined on a private statutory right of condemnation it is no longer valuable because that right has since been repealed.  (See *Murphy v. Burch* (2009) 46 Cal.4th 157, 170.) Justice Poche's views on economic feasibility remain viable, however.

6

As a textual matter, we note that syntactically section 809.2 is written in such a way as to place the burden of demonstrating infeasibility on the charging hospital. The key phrase is: "The hearing shall be held, *as determined by the peer review body* . . . ." (§ 809.2, subd. (a), italics added.) And the peer review body, in turn, is an arm of the hospital itself. Our Supreme Court described the governing structure of hospitals in *Arnett v. Dal Cielo* (1996) 14 Cal.4th 4. Hospitals must have self-governing medical staffs, those staffs adopt rules governing appropriate standards for patient care, and the staff acts through peer review committees. (*Id.* at p. 10.)[8] Thus section 809.2 puts the responsibility on the hospital, acting through the peer review committee, to organize the peer review hearing in the first place.

Tasked with organizing a peer review hearing, the hospital is further charged with insuring that the panel members are not biased. (See § 809.2, subd. (a) ["a panel of unbiased individuals who shall gain no direct financial benefit from the outcome, who have not acted as an accuser, investigator, factfinder, or initial decisionmaker in the same matter"].) The reason is, obviously, that the panel must function as the "trier of fact," in a process that is, at heart, adversarial.

Given such parameters, it is obvious the accused physician should not have to pay for the presence of a fellow specialist on a peer review panel. Not only would that possibility allow for a special taint of bias – the specialist would be peculiarly financially beholden to the accused physician – but it would turn the goal of fair procedure on its

---

[8] Here's the passage from *Arnett*:

"Every licensed hospital has a formally organized and self-governing medical staff responsible for 'the adequacy and quality of the medical care rendered to patients in the hospital.' (Cal. Code Regs., tit. 22, § 70703, subd. (a).) The medical staff is required to adopt rules for 'appropriate practices and procedures to be observed in the various departments of the hospital' (*id.*, subd. (e)), and to keep minutes of its meetings and retain them in the hospital files (*id.*, subd. (c)). The medical staff acts primarily through a number of peer review committees. These committees evaluate physicians applying for staff privileges, establish standards and procedures for patient care, assess the performance of physicians currently on staff, and review such matters as the need for and results of each surgery performed in the hospital, the functioning of the patient records system, the control of in-hospital infections, and the use and handling of drugs within the hospital. (*Id.*, subds. (b) & (d); Comment, *Anatomy of the Conflict Between Hospital Medical Staff Peer Review Confidentiality and Medical Malpractice Plaintiff Recovery: A Case for Legislative Amendment* (1984) 24 Santa Clara L. Rev. 661, 668, fn. 36 [hereafter Peer Review Confidentiality ].)" (Italics omitted.)

7

head:  Accused persons do not normally have to pay for the judges and juries who sit as triers of fact in their cases.  The hospital, on the other hand, functions in a dual role, much like the state in a criminal prosecution, of both initiating a disciplinary process *and* providing a fair forum in which that process may take place, and thus necessarily takes on the burden of providing the adjudicators of that process.

In tandem with the basic structure of peer review hearings, we note that there are times when, in the civil law at least, burdens of proof are placed on the party who is best positioned to produce the information with which to carry the burden.  (See e.g., *Harris v. Irish Truck Lines, Inc.* (1974) 11 Cal.3d 373, 378 ["The defendant is the one who was in control of the vehicle prior to the accident and who had access to knowledge of its condition at that time."]; see also *Grill v. Hunt* (1992) 6 Cal.App.4th 73, 79.)  And there can be no question that, between a hospital and an individual practitioner, it is the hospital which has the access to the information – including the hospital's own financial wherewithal to pay for it – showing whether procurement of a fellow specialist is, or is not, feasible.

Accordingly, we conclude the hospital is the party with the responsibility of showing the presence of a fellow specialist is not feasible; the accused doctor is not charged with the task of showing one *is* feasible.

D.  *Western Medical Did Not Show That Finding*

*a Neurosurgeon for Dr. Chambi's Panel Was Not Feasible*

While Western Medical has a number of neurosurgeons on its staff, the hospital says none was considered suitable for Dr. Chambi's panel, because all of them were thought to be either biased for him or against him. In fact, there apparently *was* one neurosurgeon on staff who did not begin practicing at Western Medical until Dr. Chambi had left, but he was not approached.  *Under* the hospital's bylaws, peer review panelists are first drawn from the hospital's own staff.  So, in the administrative proceedings at the hospital level, the question of feasibility quickly devolved into whether Western Medical

8

would be required to pay for the services of an *outside* neurosurgeon. Since regular staff physicians were, in effect, donating their time to being on the panel,[9] in economic terms the question was whether the hospital had to go "out of pocket" to assemble the peer review panel to include another neurosurgeon.

Western Medical points us to four places in the appellate record which, it claims, demonstrate its assertion that finding a neurosurgeon for Dr. Chambi's panel was not economically feasible. Examination of each of these citations belies its argument.[10]

(1) The first is a letter from the hospital's attorney dated December 5, 2003, to someone who appears to have been Dr. Chambi's attorney at the time. Besides asserting that the specialist requirement is only "permissive in nature and not mandatory," the letter argues that Western Medical's "neurosurgical roster is relatively small," and thus rejects out of hand the idea the medical staff "may expend its members funds to seek a reviewer from outside the Hospital." The letter argues: "First, neurosurgeons are extremely busy and finding an objective neurosurgeon to spend the requisite time would be extremely costly" and then delivers this ukase: "The Medical Staff is not prepared to expend its funds notwithstanding Mr. Kaplan's request." No facts or figures are given in support of the assertion.

(2) The second is the statement of Dr. Robert Steedman of the medical staff flatly declaring it was "very expensive" to go outside the hospital's own staff to find a neurosurgeon. And that was pretty much it. We reproduce the entirety of his remarks

---

[9] Western Medical's respondent's brief says so directly, albeit without record reference. The use of volunteered time is, however, a reasonable inference from what *is* in the record and is well known to the courts. (See *Mileikowsky v. West Hills Hospital & Medical Center* (2009) 45 Cal.4th 1259, 1272 ["We are not unmindful of the burdens the hearing process imposes on busy practitioners who voluntarily serve on a reviewing panel."].)

[10] Western Medical's brief merely contains a list of record references. We quote the actual record to show just how conclusory Western Medical's support for the idea of economic infeasibility really is.

9

in the margin to demonstrate that he didn't say much other than "very expensive."[11]  The context of the remark also emphasized the parsimonious mindset behind it:  It came right after Dr. Steedman had declared he didn't like the expense of having attorneys present.  Dr. Steedman simply extended his basic attitude about spending any money on attorneys at the hearing – an opinion to which he was entitled – to spending any money on specialists for the panel – a decision he was not entitled to make, at least not without more foundational information.

(3)  The third item cited by Western Medical arose in the context of an objection Dr. Chambi made to going outside the staff for a fellow non-specialist on the panel, an anesthesiologist working at Chapman.  The hearing officer worried out loud about the antitrust problem posed by having outside specialists on peer review panels.[12]  The officer then asked Dr. Steedman if there was "anybody who you think that you could still try to approach that you have not?"  Dr. Steedman then replied (and this is the text to which Western Medical's brief presumably is citing us) saying only the staff had talked "about" other individuals, but rejected the idea as "price prohibitive."  Again we

---

[11]     "Dr. Steedman:  One of our major situations here and what was stated in the bylaws and also stated in the statutes is that if possible someone in the same specialty should be on the committee if feasible.  And we have tried and looked and didn't think it was very feasible to utilize the neurosurgeons in our own hospital, since we had, as you know, a very few number of neurosurgeons.  They are also practicing.  They are also very difficult to contract to be on a committee like this for a long period of time.  And for those that have not helped you and been assisting you, the others are competitors.  So our responsibility was to try to pick someone who would be fair and impartial and be able to give you an adequate decision.  So that's why we didn't pick them in our own area.  To pick them from the outlying area, as previously mentioned, is a very expensive situation.  And it's very difficult to get these individuals to leave and come in and be on the committee.  So we would have to go away from our own physicians to be able to get a neurosurgeon."

[12]     The hearing officer had just alluded to a recent Time magazine article to the effect that the American College of Physicians and Surgeons didn't like the idea of even having fellow specialists on review panels, and the he opined "California law recognizes [this] by using the phrase 'where feasible' someone of the same specialty because of the competitive issues."  Then he mentioned a report of a $374 million judgment in Texas for anticompetitive credentialing "by keeping competitors of some staff members out."  And he said "it poses a continuing problem of having people in the same specialty especially where the specialty is relatively narrow."

        Because the hospital does not make the argument the absence of a fellow neurosurgeon was compelled out of the fear a fellow neurosurgeon, even one from outside the hospital staff, would be too eager to vote against Dr. Chambi simply to get rid of competition, we have no occasion to explore the *anticompetitive* theory of specialist exclusion.

reproduce the actual statement in the margin to show the conclusory nature of the assertion.[13]

(4)  Western Medical cites us to the closing argument of its own attorney at Dr. Chambi's peer review hearing, addressing the point of the need for a neurosurgeon on the panel.  Western Medical's attorney asserted it would have cost "many, many, many thousands of dollars, tens of thousands if not hundreds of thousands of dollars" to have had an outside neurosurgeon, but he otherwise gave no details or backup as to why the cost should have been so high, or why the hospital could not afford it.[14]

Thus, in this appeal, Western Medical is reduced to saying, in effect:  Take our word for it, it would have been too expensive to procure an outside neurosurgeon.  The proposition is obviously untenable.  Face value acceptance of hospital recitations of the economic infeasability of having a fellow specialist on a peer review panel would provide nothing less than a license to ignore section 809.2's "where feasible" language altogether.  We note the record references proffered by Western Medical fail to document any actual attempt to find an outside neurosurgeon *at all*, much less the cost of finding it

---

[13]  Here is the transcript from the record:
"Hearing officer:  Is there anybody who you think you could still try to approach that you have not?
"Mr. Steedman:  Not in our staff or the immediate staff, and we had talked about other individuals, and, of course, this is quite price prohibitive, that –
"Hearing officer:  Okay.  Tonight we will –
"Mr. Steedman:  And I did take this to the executive committee.  That wasn't a unilateral position.  It was presented after the panel made the suggestion, and we presented it to the executive committee, and they went along without trying to obtain somebody else as a neurosurgeon and accepted the explanation."

[14]  "Neurosurgeons, as you can well imagine, are very, very expensive as experts.  To have an outside neurosurgeon sit on this panel would have cost anywhere from 750 to a thousand dollars an hour.  It's very very expensive.
"As far as the neurosurgeons on this medical staff, like anywhere else, any workplace, people – Dr. Chambi has used some of the neurosurgeons as his assistant on many cases.  They are in Dr. Chambi's camp.  Others have been very critical of Dr. Chambi, have written letters stating that they had issues with Dr. Chambi's care.  They would have been viewed as being prejudiced against Dr. Chambi.
"It would have been incredibly difficult in a very charged place with a hearing of this type to get a neurosurgeon from our medical staff.  Therefore, we would have had to have spent many, many, many thousands of dollars, tens of thousands if not hundreds of thousands of dollars to have a neurosurgeon here during all of the times that the hearing panel deliberated.  So it was not feasible.  And it is not required.  There is not a single statute."

11

prohibitively expensive. Indeed, Dr. Steedman's remarks show the medical staff was loath to spend anything to have a fellow neurosurgeon on Dr. Chambi's panel.

In the context of California's Environmental Quality Act, it is well established that an official's "word for it" there are no feasible alternatives in a given situation is not good enough. Assertions of infeasibility must be backed up by "meaningful, reliable data." (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 398.) While we recognize that assembling a peer review panel in accord with section 809.2 is not the same thing as preparing an environmental impact report, it is safe to say that *some* minimal documentation is needed. The goal of fair process is certainly not furthered by a hospital's ipse dixit that it is "too expensive" to comply with the statute. (Cf. *Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 598-599 ["'The fact that an alternative may be more expensive or less profitable is not sufficient to show that the alternative is financially infeasible. What is required is evidence the additional costs or lost profitability are sufficiently severe as to render it impractical to proceed with the project.'"]; accord, *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336 [court's finding that reduced-size alternative was infeasible not supported by substantial evidence without data about the size of competitors]; *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1401 ["Here, the lender's letter and the economic analysis constitute substantial evidence supporting the board's finding that the reduced-herd-size alternative is not economically feasible; elimination of all profit and loss of construction financing adequately proves that the reduced-herd-size alternative is not viable."].)

Because of the total absence of data supporting the hospital's assertion that finding a fellow specialist to serve on Dr. Chambi's panel was not feasible, it would be premature at this point to speculate on what *would* support such a finding. We have not been cited to any case law on the subject or found any on our own. However, we may

12

note that the specter raised by the hospital's attorney at the closing of the hearing that it was too expensive given it might cost tens of thousands of dollars, or even exceed six figures, rings very hollow given that hospitals regularly write off such sums in regard to a *single patient*. (E.g., *Howell v. Hamilton Meats & Provisions, Inc.* (2011) 52 Cal.4th 541, 550 [total billed was $189,978.63, but $130,286.90 written off]; *Olsen v. Reid* (2008) 164 Cal.App.4th 200, 203 [$57,394.24 written off].) Suffice to say that it is hard to imagine any claim of economic infeasibility being upheld without *some* data showing the (a) length of time a hearing might be expected to take; (b) the actual cost of paying a fellow specialist to be on the panel; and (c) some discussion of the relation of that cost to the hospital's overall financial condition. Beyond that minimum, we may leave the question of what it takes to show financial infeasibility to future cases.

E. *But Dr. Chambi Has Shown No Prejudicial Error In This Appeal*

A requirement of prejudicial error is part of our state Constitution. (Cal. Const., art. 6, § 13 ["No judgment shall be set aside, or new trial granted, in any cause . . . for any error as to any matter of procedure, unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."].) And, in accord with our Constitution, it is well established that it is the *appellant* who bears the burden of producing a record which shows prejudicial error on the part of the trial court. (E.g., *People v. Whalen* (2013) 56 Cal.4th 1, 85 ["Because defendant has not supplied a record adequate to review this claim, it fails."]; *McAllister v. Los Angeles Unified School Dist.* (2013) 216 Cal.App.4th 1198, 1211 ["In particular, appellant has not included in the record a reporter's transcript of the hearing. It is appellant's burden to show error by an adequate record."].)

Here, however, Dr. Chambi has made no effort at all to show that having a fellow neurosurgeon on his panel might even *possibly* have resulted in a different outcome. He does not provide us with a reporter's transcript of the administrative

13

hearing against him. Rather, he argues the failure to have a fellow neurosurgeon on the panel, given the hospital's failure to demonstrate the infeasibility of having one, is automatically reversible as prejudice per se, since ipso facto it meant he didn't get a fair hearing.

Not so. Dr. Chambi's error per se argument misses the most obvious aspect of section 809.2's requirement a fellow specialist be on the panel – it is *conditional*. The Legislature contemplated there would be times that a fellow specialist would not be present – hence the feasibility clause – yet nevertheless the panel would be able to render a fair decision. From that possibility it follows that the absence of a fellow specialist is not a material violation of the statute that it renders any decision by the peer review panel unfair per se. (See *El-Attar v. Hollywood Presbyterian Medical Center* (2013) 56 Cal.4th 976, 991-992 [emphasizing that to trigger reversal of hospital's decision, violation of bylaws must be "material"].)[15]

In this regard we must distinguish here between matters of *bias* and matters of *expertise*. The statute is unconditional when it comes to bias. Panel members cannot have any financial interest in the outcome of the hearing. Full stop. (Cf. *Yaqub v. Salinas Valley Memorial Healthcare System* (2004) 122 Cal.App.4th 474 [retired justice doubling as hearing officer gained financially from presiding over peer review hearings and once served on hospital foundation's board with the purpose of fundraising for the hospital].)[16] Expertise, on the other hand, is a different matter. It doesn't go to fairness,

---

[15] Dr. Chambi relies on this court's decision in *Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, for the idea that a failure in the process ipso facto shows prejudice. We need not address the degree to which *Rosenblit* may be compatible with *El-Attar* on the need to show actual prejudice, because in any event *Rosenblit* is distinguishable. Unlike this case, where the Legislature contemplated the possibility of the absence of a fellow specialist on a review panel consonant with due process, *Rosenblit* involved a Kafkaesque denial of the most fundamental basics of due process, namely a hospital's refusal to give adequate notice of the charges against the physician in the first place.

[16] The hearing officer was thus right to worry out loud about the problem that a fellow neurosurgeon on the hospital's staff might have an interest in doing away with a rival. Here, for example, Dr. Chambi was *head* of neurosurgery, so his departure would open up room for another neurosurgeon to move up in the pecking order.

only potentially to the *quality* of judging.[17]  The Legislature was obviously willing to countenance situations where, because it wasn't feasible, peer review panels would not have advantage of a member within the same specialty as the accused.

Dr. Chambi's argument is also contrary to our Supreme Court's recent decision in *El-Attar, supra,* 56 Cal.4th 976, which applies here a fortiori.  In *El-Attar*, a potential for an *unfair* panel did not, by itself, warrant judicial intervention.  How much less does the absence of the insight of a specialist, by itself, warrant judicial intervention in this case.

We explain:  In *El-Attar*, a medical executive committee met to consider the possible denial of reappointment of a physician to a hospital staff and suspension of his privileges at the hospital.  The medical executive committee met, but refused to take any adverse action against the physician.  Instead, the medical executive committee delegated the task of any adverse action to the hospital's governing board.  (*Id*. at p. 984.)  The governing board then proceeded, through an existing ad hoc committee, to appoint a judicial review panel, the judicial review panel held a hearing, and found the initial decision to deny the physician reappointment was warranted.  (*Id*. at p. 985.)  After an internal appeal to the hospital's appeal board, the physician was ordered terminated from the medical staff of the hospital.  He then brought a petition for writ of mandate.  The matter reached the Court of Appeal, which held the hospital bylaws precluded the medical executive committee's initial delegation of its authority to the governing board, because preserving the "'separateness'" of the various components of the peer review process served the purpose of insulating a physician from the possibility the governing

---

[17]     As attorneys who work in specialized fields of law in state courts – say family law or probate – know altogether too well, the quality of judging can – but certainly not always – vary with the trial judge's own expertise and background.  (See Cal. Rules of Court, rule 10.603(c)(1)(A)(iii) ["In making judicial assignments, the presiding judge must take into account" factors including "the judge's judicial and nonjudicial experience, including specialized training or education"].)

body might be out to remove a doctor arbitrarily from the hospital's staff. (*Id*. at p. 986.) But the Supreme Court did not see it that way.

The high court accepted, for sake of argument, that the medical executive committee's delegation of power to the governing body was indeed contrary to the hospital's bylaws. (See *El-Attar, supra*, 56 Cal.4th at p. 990.) Even so, the physician still had to show prejudice. (*Ibid*. ["Not every violation of a hospital's internal procedures provides grounds for judicial intervention. In applying the common law doctrine of fair procedure, we have long recognized that departures from an organization's procedural rules will be disregarded unless they have produced some injustice."].) The court focused on whether the violation was "material." (*Id*. at p. 991.) It concluded the deviation from the bylaws on the delegation point was not material, noting the statute allowed for such a delegation. (*Id*. at pp. 991-992.) And finally it concluded that it was not enough, as the appellate court had thought, that the delegation of power by the medical executive committee might pose some *potential* for bias. (*Id*. at p. 997.) The Supreme Court then handed the matter back to the appellate court to adjudicate the doctor's claim that certain members in the review hearing were "in fact biased" against him. (*Ibid*.)

The lesson we take from *El-Attar* is that the mere *potential* that a review hearing might be biased against a doctor because controlled by a governing board, as distinct from a medical executive committee, is not enough to warrant judicial intervention. And, as noted, here we have even less than that – a deprivation of whatever *special insight* a fellow neurosurgeon might have brought to the table.

It might very well be the case that a specialist would have made a difference in Dr. Chambi's hearing. In a world of increasing professional specialization, it is intuitive that a specialist might bring to an adjudicatory matter insights not readily perceived by a nonspecialist.

16

Or he might not.  There are medical matters where one hardly even needs a course in high school biology to know the care was substandard.  (E.g., *Baumgardner v. Yusuf* (2006) 144 Cal.App.4th 1381, 1386 [sponge left in leg after surgery; res ipsa loquitur instruction should have been given].)  Whether this case belongs to the former category of a specialist being keenly attuned to highly nuanced exonerating details that might otherwise be missed by nonspecialist practitioners, or the latter category of gross error in technique obvious to anyone, is a question Dr. Chambi, by truncating the record and not attempting to argue actual prejudice, has removed from our consideration.[18]

## III.  DISPOSITION

The judgment is affirmed.  In the interests of justice each side will bear its own costs on appeal.

BEDSWORTH, ACTING P. J.

WE CONCUR:

ARONSON, J.

IKOLA, J.

---

[18]  The lack of inclusion of the reporter's transcript of the hearing and the absence of any argument trying to show actual prejudice appears to have been strategic on Dr. Chambi's part.  Had he undertaken the task of demonstrating, for sake of argument, that a fellow neurosurgeon would have made a difference, our statement of facts might very well have turned into a damning compendium of surgical mistakes, etched for all time on the legal databases.  As it is, we have described the charges against Dr. Chambi in only the most generic terms.